KUNGYS v. UNITED STATES

No. 86–228.   Argued April 27, 1987—Reargued October 13, 1987—
Decided May 2, 1988

762

SCALIA, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, and III–A, in which REHNQUIST, C. J., and BRENNAN, WHITE, and O'CONNOR, JJ., joined, and an opinion with respect to Parts II–B and III–B, in which REHNQUIST, C. J., and BRENNAN and (as to Part III–B only) O'CONNOR, JJ., joined. BRENNAN, J., filed a concurring opinion, *post*, p. 783. STEVENS, J., filed an opinion concurring in the judgment, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 784. O'CONNOR, J., filed an opinion concurring in part

and dissenting in part, *post*, p. 801. WHITE, J., filed a dissenting opinion, *post*, p. 801. KENNEDY, J., took no part in the consideration or decision of the case.

*Donald J. Williamson* reargued the cause for petitioner. With him on the briefs were *Michael F. Rehill* and *Ivars Berzins*.

*Robert H. Klonoff* reargued the cause for the United States. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Weld, Deputy Solicitor General Bryson, Samuel Rosenthal, Michael Wolf*, and *Joseph F. Lynch*.*

JUSTICE SCALIA announced the judgment of the Court and delivered the opinion of the Court as to Parts I, II–A, and III–A, and an opinion as to Parts II–B and III–B, in which THE CHIEF JUSTICE and JUSTICE BRENNAN joined and in Part III–B of which JUSTICE O'CONNOR joined.

Juozas Kungys seeks our review of a judgment and opinion of the Third Circuit remanding his case for the completion of denaturalization proceedings. The issues presented are: first, whether certain misrepresentations or concealments made by Kungys in connection with his naturalization proceeding were material within the meaning of the Immigration and Nationality Act of 1952, § 340(a), 66 Stat. 260, as amended, 8 U. S. C. § 1451(a), and *Chaunt* v. *United States*, 364 U. S. 350 (1960); and second, whether those misrepresentations, made under oath and in the form of forged documents, rendered Kungys' citizenship "illegally procured" under 8 U. S. C. §§ 1101(f)(6), 1427(a)(3), and 1451(a), because they

---

*William S. Hemsley, Jr.*, and *Frank A. S. Campbell* filed a brief for the Baltic-Ukranian-American Compact et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Anti-Defamation League of B'nai B'rith et al. by *Ruti Teitel, Justin J. Finger, Jeffrey P. Sinensky*, and *Jovi Tenev;* and for the World Jewish Congress by *Eli M. Rosenbaum* and *Robert H. Lande*.

established that he lacked the requisite good moral character when he was naturalized 34 years ago.

## I

Petitioner applied for an immigration visa in Stuttgart, Germany, in 1947. In 1948, the visa was issued, and he came to the United States; he was naturalized as a citizen in 1954. In 1982, the United States, acting through the Office of Special Investigations of the Department of Justice, filed a complaint pursuant to 8 U. S. C. § 1451(a) to denaturalize him.[1] The United States advanced three grounds. First, it attempted to show that Kungys had participated in executing over 2,000 Lithuanian civilians, most of them Jewish, in Kedainiai, Lithuania, between July and August 1941. As proof of this claim, the United States offered in evidence three videotaped depositions taken for use in this case in the Soviet Union. After determining that for numerous reasons the Soviet-source depositions were inherently unreliable, the District Court admitted them only for the limited purpose of showing that the atrocities actually occurred. The District Court then held that the admissible evidence was insufficient to sustain the charges that Kungys had participated in the Kedainiai atrocities.

Second, the United States attempted to show that, in applying for his visa and in his naturalization petition, Kungys had made false statements with respect to his date and place of birth, wartime occupations, and wartime residence. The

---

[1] Section 1451(a) provides in pertinent part:

"(a) It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 1421 of this title in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation . . . ."

District Court found that these misrepresentations had been made but held them not to be material within the meaning of 8 U. S. C. § 1451(a), as illuminated by language in *Chaunt* v. *United States, supra.*

Third, the United States argued that Kungys' citizenship had been "illegally procured" under § 1451(a) because when he was naturalized he lacked the good moral character required of applicants for citizenship by 8 U. S. C. § 1427(a).[2] In support of this theory, the United States asserted that Kungys' false representations, whether or not material, were sufficient to show that he had given false testimony to obtain immigration or naturalization benefits, which 8 U. S. C. § 1101(f)(6) makes determinative of lack of good moral character.[3] The District Court ruled that the false statements at issue were not covered by 8 U. S. C. § 1101(f)(6) because they were not material.

---

[2] Section 1427(a) provides:

"No person, except as otherwise provided in this subchapter, shall be naturalized unless such petitioner, (1) immediately preceding the date of filing his petition for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his petition has been physically present therein for periods totaling at least half of that time, and who has resided within the State in which the petitioner filed the petition for at least six months, (2) has resided continuously within the United States from the date of the petition up to the time of admission to citizenship, and (3) during all the period referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States."

[3] Section 1101(f)(6) provides in pertinent part:

"(f) For the purposes of this chapter—

No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—

. . . . .

(6) one who has given false testimony for the purpose of obtaining any benefits under this chapter."

Having rejected each of the three asserted grounds for denaturalization, the District Court entered judgment for Kungys. 571 F. Supp. 1104 (NJ 1983). The United States appealed. The Third Circuit declined to pass on the United States' submission that the first asserted ground (participation in the Kedainiai atrocities) was wrongfully rejected because of error in failing to admit unqualifiedly the Soviet-source depositions. It reversed, however, the District Court's rejection of the second ground, concluding that Kungys' willful misrepresentation of the date and place of his birth in connection with his applications for visa and naturalization (which was no longer disputed), was material for purposes of the "concealment or misrepresentation" provision of § 1451(a). Finally, the Third Circuit upheld the District Court's rejection of the third asserted ground for denaturalization agreeing that in order to establish "illegal procurement" under § 1451(a) on account of lack of good moral character under § 1101(f)(6), false testimony must be shown to have been material. 793 F. 2d 516 (1986).

We granted certiorari, 479 U. S. 947 (1986), and heard argument last Term, on the question of what materiality standard applies to the "concealment or misrepresentation" clause of § 1451(a) and the false testimony provision of § 1101(f)(6) as incorporated by the "illegally procured" clause of § 1451(a). On June 26, 1987, we restored the case to the calendar and directed parties to file supplemental briefs addressing certain questions.[4] 483 U. S. 1017. The case was reargued October 13, 1987.

---

[4] Those questions were:

" '(1) Whether petitioner is subject to denaturalization for want of good moral character under 8 U. S. C. §§ 1451(a), 1427(a), and 1101(f)(6), with particular attention to:

" '(a) whether the "false testimony" provision of 8 U. S. C. § 1101(f)(6) should be interpreted to include a requirement that the false testimony concern a material fact;

## II

### A

As noted above, 8 U. S. C. § 1451(a) provides for the denaturalization of citizens whose citizenship orders and certificates of naturalization "were procured by concealment of a material fact or by willful misrepresentation . . . ." This Court has previously suggested, and the parties do not dispute, that this requires misrepresentations or concealments that are both willful and material. See *Fedorenko* v. *United States*, 449 U. S. 490, 507–508, n. 28 (1981). So understood, the provision plainly contains four independent requirements: the naturalized citizen must have misrepresented or concealed some fact, the misrepresentation or concealment must have been willful, the fact must have been material, and the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment. It is no longer in dispute that the first two of these requirements were met here, since petitioner now concedes that he willfully misrepresented the date and place of his birth in his naturalization proceeding in 1954 as well as in applying for his visa in 1947.[5]

---

"'(b) what standards should govern the determination under 8 U. S. C. § 1101(f)(6) whether "false testimony" has been given "for the purpose of obtaining any benefits under this chapter . . . ."; and

"'(c) whether the latter determination is one of law or fact.

"'(2)(a) Should the materiality standard articulated in *Chaunt* v. *United States*, 364 U. S. 350 (1960), be abandoned and, if so, what standard should govern the materiality inquiry under 8 U. S. C. § 1451(a); and

"'(b) is the determination of materiality under 8 U. S. C. § 1451(a) one of law or fact.

"'(3) When a misrepresentation has been established as "material" within the meaning of 8 U. S. C. § 1451(a), must any further showing be made to establish that citizenship was "procured by" that misrepresentation.'" 483 U. S. 1017.

[5] The Government asserted that the purpose of the misrepresentations was to distance Kungys from Kedainiai, where atrocities had occurred, and to make it more difficult to identify him as one of the perpetrators. Kungys contended that even greater atrocities had occurred in the city he

This Court has had occasion to consider the last two requirements only twice. In *Chaunt* v. *United States*, 364 U. S. 350 (1960), we held that a naturalized citizen who had willfully and falsely stated during the naturalization process that he had never been arrested could nevertheless not be denaturalized pursuant to § 1451. A year later, in *Costello* v. *United States*, 365 U. S. 265 (1961), we held that a naturalized citizen who had willfully and falsely stated during the naturalization process that his occupation was "real estate," when in fact it would more accurately have been described as "bootlegging," could be denaturalized pursuant to § 1451. In neither case did the Court's opinion purport to announce a conclusive judicial test to guide the determination whether a given misrepresentation or concealment was "material" and whether it "procured" a naturalization certificate. Indeed, in neither case did the opinion clearly differentiate between these two separate requirements. Nevertheless, it has been thought that a test for materiality can profitably be derived from certain language in *Chaunt*. That language comes at the end of the opinion, where the Court, in summarizing its holding, states that "the Government has failed to show by 'clear, unequivocal, and convincing' evidence either (1) that facts were suppressed which, if known, would have warranted denial of citizenship or (2) that their disclosure might have been useful in an investigation possibly leading to the

---

falsely listed as his birthplace; and that the age difference (two years) was of little consequence for identification purposes. Kungys asserted that he had lied concerning his date and place of birth in obtaining identity documents from the Nazis to go from Lithuania to Germany—the purpose of the dissembling at that time being to place him above the age of conscription and to avoid the risk of persecution for his participation in the Lithuanian resistance movement. (Vydaudas Vidiekunas, a leader of the resistance movement validated Kungys' account of his participation.) Kungys asserted that in applying for his visa he simply repeated the information contained on his identity documents, believing the falsities inconsequential for United States immigration purposes; and that with similar belief he conformed his naturalization petition to his visa application.

discovery of other facts warranting denial of citizenship." 364 U. S., at 355. The efforts to make this formulation the test for materiality have not met with notable success. Not only have the Courts of Appeals failed to arrive at a single interpretation (compare *United States* v. *Riela,* 337 F. 2d 986 (CA3 1964), and *United States* v. *Rossi,* 299 F. 2d 650 (CA9 1962), with *Kassab* v. *INS,* 364 F. 2d 806 (CA6 1966), and *Langhammer* v. *Hamilton,* 295 F. 2d 642 (CA1 1961)), but our one attempt to dispel their confusion, see *Fedorenko,* 449 U. S., at 521, n. 4 (BLACKMUN, J., concurring in judgment), seemingly produced at least three variants on this Court, see *id.,* at 508–509; *id.,* at 523–526 (BLACKMUN, J., concurring in judgment); *id.,* at 528–530 (WHITE, J., dissenting); *id.,* at 536–538 (STEVENS, J., dissenting).

With the wisdom of experience, we now conclude that the attempts to construct a standard from the *Chaunt* dicta have been both unnecessary and unfortunate. The term "material" in § 1451(a) is not a hapax legomenon. Its use in the context of false statements to public officials goes back as far as Lord Coke, who defined the crime of perjury as follows:

> "Perjury is a crime committed, when a lawful oath is ministred by any that hath authority, to any person, in any judicial proceeding, who sweareth absolutely, and falsly in a matter material to the issue, or cause in question, by their own act, or by the subornation of others." 3 E. Coke, Institutes 164 (6th ed. 1680).

Blackstone used the same term, writing that in order to constitute "the crime of wilful and corrupt *perjury*" the false statement "must be in some point material to the question in dispute; for if it only be in some trifling collateral circumstance, to which no regard is paid," it is not punishable. 4 W. Blackstone, Commentaries *137. See also 1 W. Hawkins, Pleas of the Crown, ch. 27, § 8, p. 433 (Curwood ed. 1824). Given these common-law antecedents, it is unsurprising that a number of federal statutes criminalizing false statements to public officials use the term "material." The most

prominent of these is perhaps 18 U. S. C. § 1001, which makes unlawful willful concealment of material facts in any matter within the jurisdiction of a department or agency of the United States. The federal courts have long displayed a quite uniform understanding of the "materiality" concept as embodied in such statutes. See, *e. g., Gonzales* v. *United States,* 286 F. 2d 118, 122 (CA10) (construing 18 U. S. C. § 1001), cert. denied, 365 U. S. 878 (1961); *Weinstock* v. *United States,* 97 U. S. App. D. C. 365, 367–368, and n. 6, 231 F. 2d 699, 701–702, and n. 6 (1956) (same); *Blackmon* v. *United States,* 108 F. 2d 572, 573 (CA5 1940) (construing language now codified at 18 U. S. C. § 1621); *Carroll* v. *United States,* 16 F. 2d 951, 953 (CA2) (same), cert. denied, 273 U. S. 763 (1927); *United States* v. *Lardieri,* 497 F. 2d 317, 319 (CA3 1974) (construing 18 U. S. C. § 1623); *United States* v. *Koonce,* 485 F. 2d 374, 380 (CA8 1973) (same). The most common formulation of that understanding is that a concealment or misrepresentation is material if it "has a natural tendency to influence, or was capable of influencing, the decision of" the decisionmaking body to which it was addressed. See, *e. g., Weinstock* v. *United States, supra,* at 367–368, 231 F. 2d at, 701–702; *United States* v. *Corsino,* 812 F. 2d 26, 30–31 (CA1 1987) (citing cases). While we have before us here a statute revoking citizenship rather than imposing criminal fine or imprisonment, neither the evident objective sought to be achieved by the materiality requirement, nor the gravity of the consequences that follow from its being met, is so different as to justify adoption of a different standard. "Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *NLRB* v. *Amax Coal Co.,* 453 U. S. 322, 329 (1981). See also *Perrin* v. *United States,* 444 U. S. 37, 42–43 (1979).

One might perhaps view the *Chaunt* test as not a repudiation of the established meaning of "material," but as an attempt to craft a more precise test for what constitutes "a natural tendency to influence" a naturalization decision. Surely, however, there is no less need for precision in the criminal context than in the denaturalization context. The more general formulation is preferable there, as we think it is here, because the judgment in question does not lend itself to mechanical resolution. The disagreement between the District Court and the Court of Appeals in *Fedorenko* turned on whether the *Chaunt* test required that, had the truth been told, an investigation *would* have resulted which *would* have disclosed disqualifying facts, or rather that an investigation *would* have resulted which *might* have disclosed disqualifying facts. *Fedorenko, supra*, at 528 (WHITE, J., dissenting). But if the ultimate question is "natural tendency to influence," it would seem to make little difference whether the probabilities of investigation and resulting disclosure, respectively, are 100%–20%, 20%–100%, 51%–51%, or even 30%–30%. It has never been the test of materiality that the misrepresentation or concealment would *more likely than not* have produced an erroneous decision, or even that it would *more likely than not* have triggered an investigation. Thus, while the *Chaunt* formulation may be an adequate explanation of why the misrepresentation in that case was judged not to have had a natural tendency to influence the decision, it does not necessarily facilitate judgment in the infinite variety of other factual patterns that may emerge—which is perhaps why we did not employ it in *Costello* a year later. We think it safer in the naturalization context, as elsewhere, to fix as our guide the central object of the inquiry: whether the misrepresentation or concealment was predictably capable of affecting, *i. e.*, had a natural tendency to affect, the official decision. The official decision in question, of course, is whether the applicant meets the requirements for citizenship, so that the test more specifically is whether the misrep-

resentation or concealment had a natural tendency to produce the conclusion that the applicant was qualified. This test must be met, of course, by evidence that is clear, unequivocal, and convincing. See, *e. g., Schneiderman* v. *United States*, 320 U. S. 118, 158 (1943). Though this formulation may seem less verbally precise than *Chaunt*, in application it may well produce greater uniformity, since judges are accustomed to using it, and can consult a large body of case precedent.

We hold, therefore, that the test of whether Kungys' concealments or misrepresentations were material is whether they had a natural tendency to influence the decisions of the Immigration and Naturalization Service. To determine the effect of this holding upon our disposition of the present case, we must first consider whether materiality under § 1451(a) is an issue of law, which we may decide for ourselves, or one of fact, which must be decided by the trial court. Here again we see no reason not to follow what has been done with the materiality requirement under other statutes dealing with misrepresentations to public officers. "[T]he materiality of what is falsely sworn, when an element in the crime of perjury, is one for the court." *Sinclair* v. *United States*, 279 U. S. 263, 298 (1929). As the Sixth Circuit has said in a case involving 18 U. S. C. § 1001:

> "[A]lthough the materiality of a statement rests upon a factual evidentiary showing, the ultimate finding of materiality turns on an interpretation of substantive law. Since it is the court's responsibility to interpret the substantive law, we believe [it is proper to treat] the issue of materiality as a legal question." *United States* v. *Abadi*, 706 F. 2d 178, 180, cert. denied, 464 U. S. 821 (1983).

### B

We turn, then, to whether the one misrepresentation on which the trial court's finding was considered and upheld by the Third Circuit—misrepresentation of the date and place of

Kungys' birth—was material under the foregoing test.[6]  As discussed earlier, Kungys made that misrepresentation in both the 1947 visa proceeding and the 1954 naturalization proceeding.  But insofar as application of the "concealment or misrepresentation" clause of § 1451(a) is concerned, we find it improper to address the 1947 episode.  Unlike § 1101(f)(6), which covers false testimony "for the purpose of obtaining *any* benefits" under the immigration and naturalization laws, the "concealment or misrepresentation" clause of § 1451(a) applies only where the *"order and certificate of naturalization* . . . were procured by concealment of a material fact or by willful misrepresentation."  Procurement of other benefits, including visas, is not covered.  Especially in light of this contrast with § 1101(f)(6), we are unpersuaded by the Government's argument that a misrepresentation in the visa proceeding "procures" the naturalization because it obtains United States residence, which in turn is a prerequisite to naturalization, see 8 U. S. C. § 1429.  The same argument could be made with respect to a misrepresentation that effects free enrollment in a reading course, which produces the prerequisite of English literacy, see 8 U. S. C. § 1423.[7]  Such analysis stretches the "concealment or misrepresentation" clause of § 1451(a) beyond its intent, which we think is

---

[6] Although as JUSTICE WHITE observes there is no requirement that we focus only on this one misrepresentation, *post*, at 809, it is not our normal practice to consider fact-bound legal consequences of contested district court findings not yet reviewed by the court of appeals.

[7] JUSTICE WHITE considers the prospect of such coverage "foolish. *Post*, at 808.  As a policy matter it assuredly is, which is precisely why we use it as an example.  JUSTICE WHITE fails to establish, however, how language requiring that the "order and certificate of naturalization [be] . . . procured by . . . misrepresentation" can conceivably be interpreted to exclude this example while yet including the misrepresentation at the visa stage which (we concede) would not as a policy matter be foolish.  It is not our function to construct prudent policy except within the confines of the statutory text.

limited to falsehoods or deceptions in the naturalization proceeding.[8]

Looking, therefore, solely to the question whether Kungys' misrepresentation of the date and place of his birth in his naturalization petition was material within the meaning of § 1451(a), we conclude that it was not. There has been no suggestion that those facts were themselves relevant to his qualifications for citizenship. Even though they were not, the misrepresentation of them would have a natural tendency to influence the citizenship determination, and thus be a misrepresentation of material facts, if the true date and place of birth would predictably have disclosed other facts relevant to his qualifications.[9] But not even that has been found here. The Third Circuit merely held:

> "[H]ad [Kungys] told the truth at the time he applied for his citizenship, the discrepancies between the truth and his visa materials would have resulted in either a field investigation or an outright denial of the petition. Had an investigation transpired, . . . such investigation probably would have resulted in a denial of the petition since it would have tended to prove his ineligibility for a visa in the first instance. In this case, as previously noted,

---

[8] It is a quite different question, not argued here, whether, under the statutes governing the issuance of visas in 1947, Kungys' misrepresentations or concealments at that time *rendered his visa invalid,* thus causing his United States residence to be unlawful, and (since lawful residence is a requirement of naturalization) his naturalization to be "illegally procured" under that separate provision of § 1451(a). See *Fedorenko* v. *United States,* 449 U. S. 490, 509 (1981).

[9] JUSTICE STEVENS minimizes the substance of what we require by describing it as no more than a showing "by clear and convincing evidence that the true facts would have led to further investigation." *Post,* at 793. But further investigation would not occur—and its predictability could assuredly not be clear and convincing—if the facts at issue were not such as gave cause to believe that the applicant was not qualified. We are not talking about investigations by detective hobbyists, but by public officials seeking only evidence concerning citizenship qualifications.

the defendant's claim of persecution by the Nazis — which is directly related to eligibility — would be called into question." 793 F. 2d, at 533.

It seems to us not so clear that, had Kungys explained his earlier misstatement of date and place of birth as he has here, see n. 5, *supra*, the discrepancy would likely have produced either "outright denial" or an investigation, or that an investigation would have produced the described outcome.[10] But even a high probability that one or another of those consequences would have resulted from the discrepancy does not establish that Kungys' misrepresentation was material. Section 1451(a) imposes denaturalization for "concealment *of a material fact*" (emphasis added); and the materiality requirement implicit in the misrepresentation provision likewise relates to misrepresentation *of a material fact*. Thus, for purposes of determining the natural tendency of a misrepresentation to affect a decision under § 1451(a), what is relevant is what would have ensued from official knowledge of the misrepresented fact (in this case, Kungys' true date and place of birth), not what would have ensued from official knowledge of inconsistency between a posited assertion of the truth and an earlier assertion of falsehood. On the basis of the Third Circuit's reasoning, a misrepresentation that, in and of itself, is utterly immaterial *both* in the visa proceeding *and* in the naturalization proceeding, becomes material simply because it is repeated in both. That is not what the stat-

---

[10] We note in this regard that there was a factual dispute whether those who had been victims of Nazi persecution were given priority for nonpreference visas. Although the District Court apparently found the evidence on this point inconclusive, 571 F. Supp. 1104, 1137, n. 7 (NJ 1983), the Court of Appeals resolved the dispute in the Government's favor. We do not believe that resolution is the only one that could be drawn from the record, and thus conclude that the Court of Appeals improperly made a finding on a disputed question of fact. See *Icicle Seafoods, Inc.* v. *Worthington*, 475 U. S. 709 (1986).

ute intends. What must have a natural tendency to influence the official decision is the misrepresentation itself, not the failure to create an inconsistency with an earlier misrepresentation; the failure to state the truth, not the failure to state what had been stated earlier. The Government has failed to establish clearly, unequivocally, and convincingly that Kungys' misrepresentation of the date and place of his birth had this natural tendency.

We leave it to the Third Circuit on remand to determine whether the other misrepresentations or concealments that the District Court found to have been made in 1954 were supported by the evidence and material to the naturalization decision under the standard we have described—bearing in mind the unusually high burden of proof in denaturalization cases. *Baumgartner* v. *United States*, 322 U. S. 665, 670 (1944); *Schneiderman*, 320 U. S., at 158. If so, it will have to reach the fourth § 1451(a) issue described in our earlier analysis: whether Kungys "procured" his citizenship by means of those misrepresentations or concealments. That requirement demands, first of all, that citizenship be obtained as a result of the application process in which the misrepresentations or concealments were made. The difficult question, and that on which we part company with JUSTICE STEVENS' opinion concurring in the judgment, is what it demands beyond that. We do not agree with petitioner's contention that it requires the Government to establish that naturalization would not have been granted if the misrepresentations or concealments had not occurred. If such a "but for" causation requirement existed in § 1451(a), it is most unlikely that a materiality requirement would have been added as well—requiring, in addition to distortion of the decision, a natural tendency to distort the decision. Moreover, the difficulty of establishing "but for" causality, by clear, unequivocal, and convincing evidence many years after the fact, is so

great that we cannot conceive that Congress intended such a burden to be met before a material misrepresentation could be sanctioned. We do think, however, that the "procured by" language can and should be given some effect beyond the mere requirement that the misrepresentation have been made in the application proceeding. Proof of materiality can sometimes be regarded as establishing a rebuttable presumption. See, *e. g., Basic Inc.* v. *Levinson,* 485 U. S. 224, 245–249 (1988). Though the "procured by" language of the present statute cannot be read to *require* proof of disqualification, we think it can be read to express the notion that one who obtained his citizenship in a proceeding where he made material misrepresentations was *presumably* disqualified. The importance of the rights at issue leads us to conclude that the naturalized citizen should be able to refute that presumption, and avoid the consequence of denaturalization, by showing, through a preponderance of the evidence, that the statutory requirement as to which the misrepresentation *had a natural tendency* to produce a favorable decision was in fact met.[11] Such a construction gives ample meaning to both the "materiality" and "procured by" requirements.

JUSTICE STEVENS' concurrence would adopt a requirement of "but for" causality, emphasizing the necessity that the

---

[11] The italicized language in this sentence is ignored by the statement in JUSTICE STEVENS' concurrence that we require the applicant to "refute the existence of every disqualifying fact that *might have been* revealed by an investigation." *Post,* at 793 (emphasis added).

JUSTICE STEVENS is correct that "even demonstrating that there is a completely innocent explanation for the misrepresentation would not be sufficient" always to prevent a finding of procurement by willful misrepresentation. *Ibid.* Sometimes it might, however, since it is certainly one of the factors that the court can take into account in determining whether the applicant has established that the disqualifying fact relevant to the misrepresentation did not exist. In any case, it will assuredly be rare that a lie which has been shown, clearly, unequivocally, and convincingly, to have a natural tendency to produce the conclusion that the applicant was qualified, will have a "completely innocent explanation."

Government establish, at least, that the misrepresenting applicant was in fact not qualified to be naturalized.   This emphasis highlights another difficulty with "but for" causality: that requirement is simply not a conceivable construction of the "procured by misrepresentation" provision of § 1451(a) if one adheres, as JUSTICE STEVENS' concurrence purports to do, see *post*, at 795–796, to our holding in *Fedorenko* that even without any misrepresentation the applicant's failure to meet a statutory requirement for naturalization subjects him to denaturalization under the "illegally procured" provision of § 1451(a).   *Fedorenko*, 449 U. S., at 506–507, 514–515.[12] Thus, JUSTICE STEVENS' concurrence's construction violates the cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant.   See, *e. g.*, *Colautti* v. *Franklin*, 439 U. S. 379, 392 (1979); *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303, 307–308 (1961); *United States* v. *Menasche*, 348 U. S. 528, 538–539 (1955).   It makes nonsense of the statute to say that its misrepresentation provision can only be the basis of denaturalization if the Govern-

---

[12] JUSTICE STEVENS' concurrence avoids this difficulty by saying that *Fedorenko* does not apply to "insignificant," or "trivia[l]," or "technica[l]" requirements.   *Post*, at 799–800, n. 11.   Apart from the less than precise character of this qualification, it is nowhere to be found in *Fedorenko*, which said:

"At the same time, our cases have also recognized that there must be *strict* compliance with *all* the congressionally imposed prerequisites to the acquisition of citizenship.   Failure to comply with *any* of these conditions renders the certificate of citizenship 'illegally procured,' and naturalization that is unlawfully procured can be set aside."   449 U. S., at 506 (emphasis added).

It is, moreover, difficult to see how any *willful misrepresentation* regarding compliance with a naturalization requirement, no matter how technical that requirement, can be considered merely an "insignificant" or "trivial" violation for purposes of determining whether citizenship has been unlawfully procured.   Thus, even by amending *Fedorenko* JUSTICE STEVENS has not succeeded in showing how the willful misrepresentation provision, interpreted as he would prefer, would do anything not already achieved by the "illegally procured" provision.

ment establishes *in addition* a factor that is itself, without misrepresentation, a basis for denaturalization anyway. On JUSTICE STEVENS' concurrence's reading, the law says, in effect: Citizenship you obtain by lying may be revoked, but only for a reason other than lying. This is likely to have the congressionally desired deterrent effect upon only the most dim-witted of prevaricators. But worse than making an enigma of the statute, JUSTICE STEVENS' concurrence's position makes a scandal of the results the statute achieves: Proof that an applicant lied when he said he was not an SS officer at Dachau would not suffice for denaturalization without clear, unequivocal, and convincing proof—after 40 years of disappearing evidence—that he was guilty of war crimes.

## III

### A

The United States argues, as an alternative basis for affirming the Third Circuit's upholding of denaturalization, that Kungys' misrepresentations,.made under oath and in the form of forged documents, rendered his citizenship "illegally procured" under 8 U. S. C. §§ 1101(f)(6), 1427(a)(3), and 1451(a). As discussed earlier, the alleged ground of "illegal procurement" is that Kungys lacked the requisite good moral character in 1954, at the time of his naturalization, because he had given false testimony for the purpose of obtaining benefits in both the visa and naturalization proceedings, in violation of § 1101(f)(6). In connection with this aspect of the judgment, we address only the issue considered (and resolved in the affirmative) by the Third Circuit: whether § 1101(f)(6) contains a materiality requirement for false testimony. We hold that it does not.

Under 8 U. S. C. § 1101(f)(6), a person shall be deemed not to be of good moral character if he "has given false testimony for the purpose of obtaining" immigration or naturalization benefits. On its face, § 1101(f)(6) does not distinguish between material and immaterial misrepresentations. Liter-

ally read, it denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits. We think it means precisely what it says.

The absence of a materiality requirement in § 1101(f)(6) can be explained by the fact that its primary purpose is not (like § 1451(a)) to prevent false pertinent data from being introduced into the naturalization process (and to correct the result of the proceedings where that has occured), but to identify lack of good moral character. The latter appears to some degree whenever there is a subjective intent to deceive, no matter how immaterial the deception. A literal reading of the statute does not produce draconian results, for several reasons. First, "testimony" is limited to oral statements made under oath. The United States concedes that it does not include "other types of misrepresentations or concealments, such as falsified documents or statements not made under oath." Supplemental Brief for United States 3. See, *e. g.*, *Sharaiha* v. *Hoy*, 169 F. Supp. 598, 601 (SD Cal. 1959); *Matter of Ngan*, 10 I. & N. Dec. 725, 726 (1964); *Matter of G—L—T—*, 8 I. & N. Dec. 403, 404–405 (1959). See also *Ensign* v. *Pennsylvania*, 227 U. S. 592, 599 (1913). Second, § 1101(f)(6) applies to only those misrepresentations made with the subjective intent of obtaining immigration benefits. As the Government acknowledges:

> "It is only dishonesty accompanied by this precise intent that Congress found morally unacceptable. Willful misrepresentations made for other reasons, such as embarrassment, fear, or a desire for privacy, were not deemed sufficiently culpable to brand the applicant as someone who lacks good moral character." Supplemental Brief for United States 12.

Obviously, it will be relatively rare that the Government will be able to prove that a misrepresentation that does not have the natural tendency to influence the decision re-

garding immigration or naturalization benefits was none-theless made with the subjective intent of obtaining those benefits. This is especially so since the invalidating intent, like all other factual matters necessary to support denatural-ization, must be proved by "'clear, unequivocal, and con-vincing' evidence which does not leave 'the issue in doubt.'" *Schneiderman*, 320 U. S., at 158. Third, unlike the misrep-resentation clause of § 1451(a), the false testimony provisions of § 1101(f)(6) do not apply to "concealments." With all these built-in limitations, and given the evident purpose of the pro-vision, we see no reason for straining to avoid its natural meaning.

JUSTICE STEVENS would read a materiality requirement into § 1101(f) because in his view "[t]here is no 'material' dis-tinction," *post*, at 797, between the language of that provision and the language of § 10 of the Displaced Persons Act of 1948 (DPA), which we found to contain a materiality requirement in *Fedorenko*. We think there is a world of difference between the two. First, the texts of the statutes are significantly dif-ferent. Section 10 of the DPA uses the phrase "willfully make a misrepresentation." Our conclusion in *Fedorenko* that this contains a materiality requirement was grounded in the word "misrepresentation," which has been held to have that implication in many contexts—as the name of the common-law tort of misrepresentation (which requires a ma-terial falsehood) adequately demonstrates. Section 1101(f), by contrast, uses the phrase "giv[e] false testimony." While we do not say that statutory use of the term "false" or "fal-sity" can never imply a requirement of materiality, such a re-quirement is at least not so commonly associated with that term as it is with misrepresentation. In fact, we recently described falsity and materiality as *separate* requirements of misrepresentation, see *Basic Inc.* v. *Levinson*, 485 U. S., at 238, 239–240, n. 17. Second, the statutory provisions differ in their purpose and their relationship to other provisions in their respective statutory schemes. Section 10 of the DPA,

like the willful misrepresentation provision of § 1451(a), is a freestanding provision having no apparent purpose but to punish and thereby deter misrepresentation in the immigration process. Section 1101(f)(6), on the other hand, is part of a definition of what constitutes a lack of "good moral character" for purposes of qualifying for immigration. More importantly, § 10 is the only provision treating misrepresentation in the DPA, whereas § 1101(f)(6) must be reconciled with the willful misrepresentation provision of § 1451(a). That seems to us ill achieved by reading the two differently worded provisions (or, as the concurrence would have it, *three* differently worded provisions, see, *supra,* at 777–779) to be redundant.

## B

Accordingly, it is clear that the Third Circuit erred in importing a materiality requirement into § 1101(f)(6). Nevertheless, we cannot affirm denaturalization under that section because the question whether any misrepresentation made by Kungys constituted "false testimony for the purpose of obtaining" immigration or naturalization benefits cannot be answered without resolving an additional question of law and an additional question of fact. The former, which we choose not to resolve ourselves, since the case must be remanded in any event, is whether Kungys' misrepresentations constituted "testimony." The latter, which must be resolved by the trier of fact, is whether in making the misrepresentations Kungys possessed the subjective intent of thereby obtaining immigration or naturalization benefits. See generally *Pullman-Standard* v. *Swint,* 456 U. S. 273, 288 (1982) (issues of intent are factual matters for the trier of fact); *Berenyi* v. *District Director, INS,* 385 U. S. 630, 634–635 (1967). We are unpersuaded by the United States' argument that Kungys' so-called pattern of lies establishes the illegal subjective intent of his alleged false testimony as a matter of law.

* * *

For the reasons stated, the judgment of the Third Circuit is reversed, and the case remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE BRENNAN, concurring.

I join the Court's opinion. I write separately, however, to spell out in more detail the showing I believe the Government must make to raise a presumption of ineligibility. The Court holds that a misrepresentation is material if it has "a natural tendency to produce the conclusion that the applicant was qualified" for citizenship. *Ante,* at 772. A misrepresentation or concealment can be said to have such a tendency, the Court explains, if honest representations "would predictably have disclosed other facts relevant to [the applicant's] qualifications." *Ante,* at 774. Proof by clear, unequivocal, and convincing evidence that the misrepresentation had this tendency raises a presumption of ineligibility, which the naturalized citizen is then called upon to rebut. *Ante,* at 777.

I agree with this construction of the statute. I wish to emphasize, however, that in my view a presumption of ineligibility does not arise unless the Government produces evidence sufficient to raise a fair inference that a statutory disqualifying fact actually existed. It is this fair inference of ineligibility, coupled with the fact that the citizen's misrepresentation necessarily frustrated the Government's investigative efforts, that in my mind justifies the burden-shifting presumption the Court employs. Evidence that simply raises the possibility that a disqualifying fact might have existed does not entitle the Government to the benefit of a presumption that the citizen was ineligibile, for as we have repeatedly emphasized, citizenship is a most precious right, see, *e. g.,* *Klapprott* v. *United States,* 335 U. S. 601, 611–612 (1949),

and as such should never be forfeited on the basis of mere speculation or suspicion. I therefore would not permit invocation of the presumption of disqualification in circumstances where it would not otherwise be fair to infer that the citizen was actually ineligible.

Because nothing in the Court's opinion is inconsistent with this standard, I join it.

JUSTICE STEVENS, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring in the judgment.

American citizenship is "a right no less precious than life or liberty." *Klapprott* v. *United States*, 335 U. S. 601, 616–617 (1949) (Rutledge, J., concurring in result). For the native-born citizen it is a right that is truly inalienable. For the naturalized citizen, however, Congress has authorized a special procedure that may result in the revocation of citizenship. That statute provides that a certificate of naturalization may be canceled and an order granting citizenship revoked if the Government proves that "such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation." 8 U. S. C. § 1451(a).[1]

In this case the Government maintains that petitioner is subject to denaturalization because it has proved that he made certain misrepresentations in his 1947 Application for Immigration Visa (Quota), which he repeated in his October 23, 1953, Petition for Naturalization. He stated that his date of birth was October 4, 1913, when it in fact was September 21, 1915; he stated that his place of birth was Kaunas, Lithuania, when it was in fact Reistru. He asserted that he

---

[1] Although the denaturalization statute refers to "willful misrepresentation" and "concealment of a material fact" in the disjunctive, this Court has construed the statute to require that the concealment, no less than the misrepresentation, be willful and that the misrepresentation, no less than the concealment, relate to a material fact. See *Costello* v. *United States*, 365 U. S. 265, 271–272, n. 3 (1961); *Fedorenko* v. *United States*, 449 U. S. 490, 507–508, n. 28 (1981).

resided in Kedainiai, Lithuania, only through July 1941, when in fact he did not leave Kedainiai until October 1941. He failed to disclose that he had been a bookkeeper-clerk in a Kaunas brush and broom establishment during the war. The Government failed in its efforts to prove that petitioner would have been denied a visa if he had disclosed the true facts in his application. It also failed to prove that truthful responses would have led to a more complete investigation of petitioner's background before granting him a visa or that an investigation would have revealed any fact that would have disqualified petitioner from obtaining a visa. Indeed, the Government failed to prove the existence of any fact that, if known, would have led to the denial of petitioner's visa application or disqualified him from later becoming an American citizen.

In support of its position that petitioner's false statements in 1947 and 1953 justify his denaturalization the Government makes two separate legal arguments. First, it argues that the misrepresentations were "material" within the meaning of § 1451(a) and that they procured petitioner's citizenship. Second, the Government urges that petitioner's citizenship was "illegally procured," because his misrepresentations — even if not material — demonstrate that he lacked the requisite good moral character at the time of his application for citizenship. Neither argument is tenable.

I

Over a quarter of a century ago, in *Chaunt* v. *United States*, 364 U. S. 350 (1960), the Court considered a case in which the District Court found that petitioner had concealed his membership in the Communist Party as well as three arrests that, had they been disclosed, would have led to further investigation by the Immigration and Naturalization Service. Although the dissenting Justices thought that Chaunt's failure to tell the truth about his arrest record was sufficient reason to revoke his citizenship, see *id.*, at 360, the majority

came to the contrary conclusion. It held that the Government had failed to prove "either (1) that facts were suppressed which, if known, would have warranted denial of citizenship or (2) that their disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship." *Id.*, at 355. Thus we announced a test for whether citizenship was procured by a material misrepresentation that required the Government to prove the existence of a disqualifying fact. This result was compelled both by the statute's requirement that the misrepresentation be material and by the requirement that it procure citizenship. The controversy between the parties here makes it necessary to parse the statute, paying particular attention to the meaning of the word "material." That parsing, however, merely confirms the conclusion we reached in *Chaunt*.

"Material" means "having real importance" or "great consequences." Webster's Ninth New Collegiate Dictionary 733 (1983). The adjective "material" is widely used to distinguish false statements that are actionable at law from those that are not. In the context of criminal false statements, the term "material" has been said to require that the false statement be one that had "a natural tendency to influence, or was capable of influencing, the decision of" the decisionmaking body to which it was addressed. See *ante*, at 770. In tort law, a misrepresentation is material if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." Restatement (Second) of Torts § 538, p. 80 (1977). In contract law, a misrepresentation is material if "it would be likely to induce a reasonable person to manifest his assent." Restatement (Second) of Contracts § 162, p. 439 (1981).

In all of these contexts, the use of the word "material" serves to distinguish the trivial from the substantive, drawing the line between statements that appear to be capable of

influencing an outcome and those that do not. It is reasonable to assume that the term serves the same role in the denaturalization statute. It guarantees that trivial misstatements do not result in the loss of citizenship by making actionable only those that are capable of influencing the decision whether to confer citizenship. This principle may be stated more specifically. Unlike the decision to enter a contract or to do some act in detrimental reliance on the assertion of another, the decision whether to grant citizenship is an objective one. The applicant either does or does not possess the requisite qualifications. The process relies on facts, not hunches or intuitions. Thus, in the denaturalization context, the only statements that are capable of influencing the outcome are those that conceal disqualifying facts or that prevent or hinder the discovery of disqualifying facts. Our statement in *Chaunt* was not a rejection of the traditional definition of materiality, it was merely an acknowledgment of the realistic consequences of that term's use in the context of an objective decisionmaking process.

Our holding in *Chaunt* is also supported by the statutory requirement that there must be a causal connection between the misrepresentation and the award of citizenship. Section 1451(a) provides that the Government must demonstrate that the misrepresentation "procured" citizenship. That is, the statute requires that the Government demonstrate that it relied on the misrepresentation in deciding whether to allow the applicant to become a citizen. In imposing this causation requirement, the statute again merely tracks the law of actionable misrepresentation in other contexts. A material misrepresentation, that is, a statement not in accordance with the truth that a reasonable person would attach importance to in deciding whether to enter a contract, may form the basis for voiding or reforming the contract, but only if the contracting party in fact relied on the statement in entering the contract. Restatement (Second) of Contracts § 164. The material misrepresentation must have induced the re-

cipient of the statement to enter the contract.[2]  Likewise, in tort law, a person may recover for a loss resulting from another's material misrepresentation, but only if he or she in fact relied upon the misrepresentation to his or her detriment.  Restatement (Second) of Torts § 525.  Although in both contract and tort law it is recognized that if a misrepresentation was material, the recipient probably relied on it, that probability does not alleviate the requirement that inducement be proved distinctly.  Restatement (Second) of Contracts § 167.

If anything, the causation requirement of § 1451(a) is stricter than that in tort and contract law.  The statute specifically requires that the material misrepresentation "procure" citizenship, not merely that it have been an inducement to granting citizenship.  Thus it requires that the material misrepresentation must have had the effect of allowing the person to obtain citizenship when a truthful statement would have led directly or after investigation to the denial of citizenship.  In other words, the Government must have relied on the statement in offering the defendant the opportunity to become a citizen.  Although as is recognized in tort and contract law, it is likely that any material misrepresentation was relied on by the Government, this likelihood does not change the burden imposed by the statute.[3]

---

[2] Contract law also allows recovery for *non*material statements if they are fraudulent.  But even in this instance the misrepresentation must have induced the formation of the contract.  Restatement (Second) of Contracts § 167 (1981).

[3] The following example, though admittedly unlikely, demonstrates the distinction in the roles played by the materiality and procurement elements.  Suppose an individual appears to qualify for American citizenship on two distinct grounds.  He or she claims to have lived in the United States the required number of years and to be "a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United

Thus the Government cannot prevail in a denaturalization action based on a false statement in an application for a naturalization certificate unless it can prove by clear, unequivocal, and convincing evidence the existence of a disqualifying fact. To prove that a misrepresentation was material, the Government must prove that the statement concealed a disqualifying fact or hindered the discovery of a disqualifying fact. Further, the existence of a disqualifying fact is a necessary element of the Government's proof of reliance. Unless a disqualifying fact existed, it cannot be said that a misrepresentation "procured" citizenship. Section 1451(a) does not allow an individual who was in all ways qualified to be an American citizen to be deprived of that citizenship because of a false statement that did not prevent the discovery of a fact that would have affected his or her eligibility to become a United States citizen. Together and separately, the materiality and procurement requirements reflect congressional intent that citizenship status not be taken away unless the Government proves that the person was not qualified to hold that status at the time it was obtained.[4]

States." See 8 U. S. C. § 1427(a). The individual also claims to be the surviving spouse of an American member of the Armed Forces who died while on active duty. See 8 U. S. C. § 1430(d). The claim to be a surviving spouse is false, but the other representations are true. The claim to be a surviving spouse is clearly material because it is capable of influencing the outcome of the naturalization process. However, if in fact citizenship was conferred because of the individual's other qualifications, then the Government would not be able to demonstrate that the material misrepresentation "procured" citizenship.

[4] As I stated in *Fedorenko* v. *United States*, 449 U. S. 490 (1981):

"There are really three inquiries [under the *Chaunt* test]: (1) whether a truthful answer would have led to an investigation, (2) whether a disqualifying circumstance actually existed, and (3) whether it would have been discovered by the investigation. Regardless of whether the misstatement was made on an application for a visa or for citizenship, in my opinion the proper analysis should focus on the first and second components and attach little or no weight to the third. Unless the Government can prove the ex-

In his separate opinion in *Fedorenko* v. *United States*, 449 U. S. 490, 518 (1981), JUSTICE BLACKMUN correctly pointed out that as construed by our decision in *Chaunt* the misrepresentation ground of § 1451(a) requires that the Government "prove the'existence of disqualifying facts." *Id.*, at 523–524.[5]   Until today, JUSTICE WHITE was the only Mem-

istence of a circumstance that would have disqualified the applicant, I do not believe that citizenship should be revoked on the basis of speculation about what might have been discovered if an investigation had been initiated.   But if the Government can establish the existence of a disqualifying fact, I would consider a willful misstatement material if it were more probable than not that a truthful answer would have prompted more inquiry." *Id.*, at 537 (STEVENS, J., dissenting).

[5]JUSTICE BLACKMUN continued:

"First, this Court's reasoning before *Chaunt* contains no suggestion that a naturalized citizen would be reduced to alien status merely because a thwarted Government inquiry *might* have shown him to be unqualified. Instead, the Court has been willing to approve denaturalization only upon a clear and convincing showing that the prescribed statutory conditions of citizenship had never been met.   This, it seems to me, is the clear import of the Court's exhaustive reviews in *Nowak* v. *United States,* 356 U. S., at 663–668; *Knauer* v. *United States,* 328 U. S., at 656–669; *Baumgartner* v. *United States,* 322 U. S., at 666–678; and *Schneiderman* v. *United States,* 320 U. S., at 131–159.   Of course, the Government's ability to investigate with vigor may be affected adversely by its inability to discover that certain facts have been suppressed.   That standard announced by the Court of Appeals, however, seems to me to transform this interest in unhampered investigation into an end in itself.   Application of that court's standard suggests that a deliberately false answer to any question the Government deems worth asking may be considered material.   I do not believe that such a weak standard of proof was ever contemplated by this Court's decisions prior to *Chaunt.*

"Instead, I conclude that the Court in *Chaunt* intended to follow its earlier cases, and that its 'two tests' are simply two methods by which the existence of ultimate disqualifying facts might be proved.   This reading of *Chaunt* is consistent with the actual language of the so-called second test; it also appears to be the meaning that the dissent in *Chaunt* believed the Court to have intended.

"Significantly, this view accords with the policy considerations informing the Court's decisions in the area of denaturalization.   If naturalization can be revoked years or decades after it is conferred, on the mere suspicion

ber of the Court to have disagreed with this reading of the *Chaunt* opinion. Even today, it is not clear whether the Court disagrees with this interpretation of *Chaunt*, or simply rejects it based on its current notion of "the wisdom of experience." See *ante*, at 769.

In my opinion, the wisdom of experience has provided firm support for *Chaunt*'s holding. Our construction of the denaturalization statute must be animated by our longstanding recognition of the severity of the sanction being sought. I firmly believe that denaturalization is far too heavy a sanction to impose on an otherwise innocent citizen for making false statements in 1947 and 1953. Without evidence of any wrongdoing before he came to the United States in 1948 or after he acquired his citizenship in 1954, the revocation of petitioner's citizenship—a punishment that is tantamount to exile or banishment—is patently excessive.[6]

The wisdom of experience is further reflected in our prior cases imposing a special burden on the Government when it

---

that certain undisclosed facts *might* have warranted exclusion, I fear that the valued rights of citizenship are in danger of erosion." 449 U. S., at 524–526 (emphasis in original) (footnotes omitted).

[6] In his concurrence explaining why special procedural safeguards are appropriate in denaturalization proceedings, Justice Rutledge advanced an argument that further demonstrates the importance of the requirement that the Government prove the existence of a disqualifying fact. He wrote:

"To take away a man's citizenship deprives him of a right no less precious than life or liberty, indeed of one which today comprehends those rights and almost all others. To lay upon the citizen the punishment of exile for committing murder, or even treason, is a penalty thus far unknown to our law and at most but doubtfully within Congress' power. U. S. Const., Amend. VIII. Yet by the device or label or a civil suit, carried forward with none of the safeguards of criminal procedure provided by the Bill of Rights, this most comprehensive and basic right of all, so it has been held, can be .taken away and in its wake may follow the most cruel penalty of banishment.

"No such procedures could strip a natural-born citizen of his birthright or lay him open to such a penalty." *Klapprott* v. *United States*, 335 U. S. 601, 616–617 (1949).

seeks to denaturalize an American citizen. Thus, in explaining why the Government's burden of proof in this kind of civil proceeding is equivalent to that enforced in criminal cases, and why default judgments in denaturalization proceedings are intolerable, the Court has written:

> "Denaturalization consequences may be more grave than consequences that flow from conviction for crimes. . . . This Court has long recognized the plain fact that to deprive a person of his American citizenship is an extraordinarily severe penalty. The consequences of such a deprivation may even rest heavily upon his children. 8 U. S. C. § 719. As a result of the denaturalization here, petitioner has been ordered deported. 'To deport one who so claims to be a citizen, obviously deprives him of liberty . . . . It may result also in loss of both property and life; or of all that makes life worth living.' *Ng Fung Ho* v. *White*, 259 U. S. 276, 284 [1922]. Because denaturalization proceedings have not fallen within the technical classification of crimes is hardly a satisfactory reason for allowing denaturalization without proof while requiring proof to support a mere money fine or a short imprisonment.

> "Furthermore, because of the grave consequences incident to denaturalization proceedings we have held that a burden rests on the Government to prove its charges in such cases by clear, unequivocal and convincing evidence which does not leave the issue in doubt. *Schneiderman* v. *United States*, 320 U. S. 118, 158 [1943]. This burden is substantially identical with that required in criminal cases—proof beyond a reasonable doubt." *Klapprott* v. *United States*, 335 U. S., at 611–612.

Virtually ignoring the foregoing settled law, today the Court announces a new burden-shifting presumption that lowers the standard of proof required for the Government to prevail in a denaturalization proceeding. Under the Court's test, a misrepresentation or concealment is material if it con-

cerned a fact that was relevant to the naturalization decision or if the true facts "would predictably have disclosed other facts relevant to [the citizen's] qualifications." *Ante*, at 774. A fact may be relevant if it would have led to an investigation. *Ante*, at 775. Thus the Government becomes entitled to the presumption that the citizen was not qualified to become a citizen, that is, to the presumption that citizenship was "procured by" the misrepresentation, if it shows by clear and convincing evidence that the true facts would have led to further investigation. The citizen then bears the burden of "showing, through a preponderance of the evidence, that the statutory requirement as to which the misrepresentation *had a natural tendency* to produce a favorable decision was in fact met." *Ante*, at 777 (emphasis in original). Since under the Court's test the Government is never required to identify a specific disqualifying fact, apparently the citizen must refute the existence of every disqualifying fact that might have been revealed by an investigation. The Government need not introduce any proof whatsoever suggesting the existence of a disqualifying fact.

Though joining the Court's opinion, JUSTICE BRENNAN would require more. He would not allow the Government the benefit of the presumption unless it first produced "evidence sufficient to raise a fair inference that a statutory disqualifying fact actually existed." *Ante*, at 783. Although JUSTICE BRENNAN imposes a burden of production on the Government, he agrees with the majority that the burden of ultimate persuasion rests with the defendant. Under JUSTICE BRENNAN's approach, however, the defendant at least has the benefit of knowing specifically what disqualifying fact must be rebutted. Both approaches require the defendant to rebut the existence of the presumed disqualifying fact — even demonstrating that there is a completely innocent explanation for the misrepresentation would not be sufficient to rebut the presumption.

Neither the majority's nor JUSTICE BRENNAN's formulation of shifting burdens is faithful to our previous recognition of the special burden the Government must bear when it seeks to denaturalize an American citizen or to our previous rejection of default judgments in denaturalization proceedings. See *Klapprott* v. *United States*, 335 U. S., at 611–612; *supra*, at 790–792.[7] "[B]ecause of the grave consequences incident to denaturalization proceedings," *Klapprott*,

---

[7] In *Schneiderman* v. *United States*, 320 U. S. 118 (1943), a case in which the Government sought "to turn the clock back twelve years after full citizenship was conferred upon petitioner by a judicial decree, and to deprive him of the priceless benefits that derive from [citizenship] status," we discussed the grave consequences of denaturalization and the special burden borne by the Government in denaturalization proceedings:

"In its consequences it is more serious than a taking of one's property, or the imposition of a fine or other penalty. For it is safe to assert that nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. It would be difficult to exaggerate its value and importance. By many it is regarded as the highest hope of civilized men. This does not mean that once granted to an alien, citizenship cannot be revoked or cancelled on legal grounds under appropriate proof. But such a right once conferred should not be taken away without the clearest sort of justification and proof. So, . . . in an action instituted . . . for the purpose of depriving one of the precious right of citizenship previously conferred we believe the facts and the law should be construed as far as is reasonably possible in favor of the citizen. Especially is this so when the attack is made long after the time when the certificate of citizenship was granted and the citizen has meanwhile met his obligations and has committed no act of lawlessness. It is not denied that the burden of proof is on the Government in this case.

"... [A] certificate of citizenship is 'an instrument granting political privileges, and open like other public grants to be revoked if and when it shall be found to have been unlawfully or fraudulently procured.' . . . To set aside such a grant the evidence must be 'clear, unequivocal, and convincing,'—'it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt.' . . . This is so because rights once conferred should not be lightly revoked. And more especially is this true when the rights are precious and when they are conferred by solemn adjudication, as is the situation when citizenship is granted." *Id.*, at 122–123, 125.

335 U. S., at 612, this Court has always held that the Government must prove its charges in denaturalization cases by clear, unequivocal, and convincing evidence which does not leave the issue in doubt. We have recognized that this burden is substantially identical to the beyond-a-reasonable-doubt burden of proof borne by the Government in criminal cases. *Ibid.* Indeed, the factors that support the imposition of so heavy a burden are largely the same in both contexts—particularly critical are the immense importance of the interests at stake, *ibid.; In re Winship,* 397 U. S. 358, 363 (1970), the possibility of loss of liberty, *Klapprott,* 335 U. S., at 612; *In re Winship,* 397 U. S., at 363, the resultant stigmatization, *Schneiderman* v. *United States,* 320 U. S. 118, 122–23 (1943); *In re Winship,* 397 U. S., at 363, and the societal interest in the reliability of the outcome, *id.,* at 363–364. The use of burden-shifting presumptions to reduce the Government's burden of proof in criminal cases has been consistently rejected by this Court without regard to whether the presumptions were rebuttable. See *Francis* v. *Franklin,* 471 U. S. 307, 313 (1985), and cases cited therein. Such presumptions are equally objectionable in the denaturalization context.

## II

The reasons why the Court has required the Government to carry a heavy burden of proof in denaturalization cases apply equally to the argument that petitioner is subject to denaturalization because his false statements demonstrate that he lacked good moral character in 1953.

As amended in 1961, § 1451(a) allows the Government to revoke the citizenship of anyone whose citizenship was "illegally procured." In *Fedorenko,* we held that citizenship had been illegally procured because the petitioner, a former armed concentration camp guard, was ineligible for the visa he had been issued under the Displaced Persons Act of 1948 (DPA), 62 Stat. 1009. Because the naturalization statutes required applicants to be lawfully admitted to the United

States for permanent residence, petitioner had failed to "satisfy a statutory requirement which Congress has imposed as a prerequisite to the acquisition of citizenship by naturalization." *Fedorenko*, 449 U. S., at 515. One prerequisite to naturalization is that the applicant be of "good moral character." 8 U. S. C. § 1427(a). Certain minimum standards for being deemed in possession of good moral character are set out in 8 U. S. C. § 1101(f). Subsection 6 of § 1101(f) provides that no person shall be deemed to be of good moral character if he or she "has given false testimony for the purpose of obtaining any benefits under this chapter." The Government contends that it is not necessary for it to establish that petitioner's false statements were material to denaturalize him under this provision. Under the Government's theory, the mere fact that the statements were false is sufficient to compel petitioner's denaturalization if they were made under oath and with the subjective intention of obtaining a benefit—any benefit, no matter how trivial[8]—under the natural-

---

[8] At oral argument, counsel for the Government made the following remarks in response to questioning by a Member of the Court:

"QUESTION: You know, there are a lot of people that came to this country who were given different names at Ellis Island. The immigration officer couldn't pronounce the name, and they said, well, Sam, is that okay? Yeah, that's my name Sam. Now his name wasn't Sam.

"Did he give that name to procure the visa, or to procure admission to the United States, falsely to procure?

"MR. KLONOFF [Assistant to the Solicitor General]: That's a factual question in each case, we would submit.

"QUESTION: He just wants to facilitate the thing. The guy will never learn how to spell Salvator, or whatever the name is, and the officer—it's happened very often.

"MR. KLONOFF: It has to be a question of fact. If the person had adopted a false I. D. many, many years earlier for a totally different purpose—

"QUESTION: No, no, there is no evil purpose except to facilitate getting in. I don't want to be here, you know, trying to straighten out what

ization laws. Because I am convinced that a materiality requirement is implicit in § 1101(f)(6), I reject this contention.

In *Fedorenko* v. *United States*, we were called upon to interpret the language of § 10 of the DPA, which provided that "[a]ny person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States." 62 Stat. 1013. We held, agreeing with the Government, that this provision applied "only [to] willful misrepresentations about 'material' facts." 449 U. S., at 507. We found the implication of a materiality requirement in the DPA's willful misrepresentation section to follow logically from our construction of § 1451(a) as having such a requirement even though its plain language requires only that the misrepresentation have been willful. That same logic applies here. There is no "material" distinction between the language of the DPA at issue in *Fedorenko* and the language of § 1101(f)(6). See *United States* v. *Sheshtawy*, 714 F. 2d 1038, 1041 (CA10 1983). It is implausi-

---

the proper spelling of my name is. He says Sam, what do I care; Sam is fine.

"MR. KLONOFF: If he adopted a false identity to facilitate getting in and jumped ahead of the pack—

"QUESTION: Do you consider that facilitating getting in?

"MR. KLONOFF: We would.

"QUESTION: Just to facilitate—to make it quicker so the fellow doesn't have to figure out how to spell Salvator.

"MR. KLONOFF: That would be our position. That's consistent with the statutory—

"QUESTION: Wow, that's a tough position, and I think there are probably a lot of people that are excludable." Tr. of Oral Arg. 39–40.

The observation that a lot of people would be excludable (and a lot of Americans put at risk of losing their citizenship) under the Government's interpretation is, of course, correct. The example instructs that misrepresentations as to matters that are immaterial to the decisions being made by immigration officials simply do not reflect the lack of good moral character § 1101(f)(6) seeks to identify.

ble to suggest that Congress intended by the language of the DPA to engraft a materiality requirement, but had no such intention in drafting § 1101(f)(6).[9]

In addition to requiring materiality, both § 10 of the DPA and § 1101(f)(6) require that the false statement have been made for the purpose of obtaining a benefit under the immigration and naturalization laws. The Government would have us adopt a subjective test of the individual's motive in any particular case, thus forcing the factfinder to inquire of the defendant in each case why the particular falsehood was asserted and insuring that many citizenship determinations would boil down to credibility battles. An objective test is far more reasonable. Under an objective approach, a false testimonial statement would be considered made "for the purpose of obtaining any benefits under [the immigration laws]" if it in fact had the effect of giving the defendant a benefit under the immigration laws. An objective test would eliminate the necessity of inquiring in each case whether a person lied about his or her date of birth for personal reasons,

---

[9] It is somewhat ironic that both the Government and the Court accept the fact that a materiality requirement is implicit in the disjunctive reference to "willful misrepresentation" in § 1451(a), see *ante,* at 767, but reach a contrary conclusion with respect to § 1101(f)(6). Moreover, the implication of a materiality requirement in § 1101(f)(6) is consistent with the interpretation of 18 U. S. C. § 1015(a), which punishes the making of "any false statement under oath, in any case, proceeding, or matter relating to . . . naturalization, citizenship, or registry of aliens." Courts have construed the statute to contain a requirement that the false statement be material. *United States* v. *Bressi,* 208 F. 369, 370–371 (WD Wash. 1913) (to constitute the crime of false swearing in a naturalization case the testimony given had to be material even though the statute does not expressly so state); *United States* v. *Laut,* 17 F. R. D. 31, 34 (SDNY 1955) (courts have consistently construed § 1015(a) and its forebears to have a materiality requirement even though the statute does not expressly contain this limitation).

such as mere vanity, or to conceal information that would lead to the denial of a visa or certificate of naturalization.[10] If the false statement as to age actually had the effect of obtaining for the individual a benefit he or she would not otherwise have enjoyed, then, and only then, would American citizenship have been "illegally procured." An objective test is more consistent with the heavy burden of proof borne by the Government in denaturalization cases and with the severity of the sanction. Because states of mind are notoriously difficult to prove, an objective test also has the critical virtue of diminishing the risk of erroneous determinations.

It is obvious that there is some overlap between the scope of the misrepresentation and illegally-procured clauses of § 1451(a).[11] That the Government may in some cases be able to choose one of two available paths for denaturalizing a citi-

---

[10] Counsel for the Government asserted at oral argument:

"Let me just round the situation out. Let's say that age is fundamentally important to the decision that's being made, but the person doesn't know this. He lies about his age not because he's trying to obtain immigration benefit, but because his wife is sitting there next to him and throughout their marriage he has lied about his age and he doesn't want to tell the truth.

"Now, that type of lie is willful. He clearly was lying deliberately, but he wasn't lying to obtain immigration benefits. . . . He has made a material misrepresentation and it's willful, but he doesn't fit within the good moral character provisions." Tr. of Oral Arg. 29–30.

[11] Although they overlap, they are not coterminous. Illegal procurement originally appeared as a ground for denaturalization in the Act of June 29, 1906, Pub. L. 59–338, § 15, 34 Stat. 601, which provided that denaturalization proceedings could be based "on the ground of fraud or on the ground that such certificate of citizenship was illegally procured." The provision was retained in the Nationality Act of 1940, Pub. L. 76–853, 54 Stat. 1137. It was deleted, however, in the Immigration and Nationality Act of 1952, Pub. L. 82–414, § 340(f), 66 Stat. 261, which substituted the provision that citizenship could be revoked if it was procured by "concealment of a material fact or by willful misrepresentation." The purpose of the change in language was to make clear that the statute en-

zen for essentially the same conduct, however, does not suggest that either of the paths should be made more lenient than Congress intended.

---

compassed both extrinsic and intrinsic fraud. S. Rep. No. 1515, 81st Cong., 2d Sess., 756, 769 (1950).

Illegal procurement was restored as an alternative ground for denaturalization by the Act of September 26, 1961, Pub. L. 87–301, § 18, 75 Stat. 656. It is clear from the legislative history that the purpose of the restoration was to allow denaturalization of persons who did not meet important statutory prerequisites for naturalization but who were not guilty of willful misrepresentation. See H. R. Rep. No. 1086, 87th Cong., 1st Sess., 1, 38–40 (1961). Congress was particularly concerned that criminal conduct such as rape, incest, and fraud could not form the basis for denaturalization without the illegally-procured provision. Although the illegally-procured provision may reach some of the conduct encompassed within the material misrepresentation provision, the illegally-procured provision has an independent and broader reach.

Further, the material misrepresentation provision reaches some conduct not assailable under the illegally-procured provision. The Government contends that construing the material misrepresentation provision to require proof of a disqualifying fact renders that provision meaningless since the Government could always seek denaturalization under the illegally-procured provision if it could prove a disqualifying fact. The Government apparently construes our holding on the facts in *Fedorenko* that citizenship may be considered illegally procured if it is discovered that the applicant failed at the time citizenship was conferred to meet a statutory prerequisite of citizenship as warranting the conclusion that every newly discovered noncompliance, no matter how insignificant, would warrant a subsequent finding that citizenship had been illegally procured. Thus, for example, an innocent miscalculation of the applicant's period of physical presence within the United States or residence within a particular State, see *ante*, at 765, n. 2, would place a naturalized citizen's status in permanent jeopardy. I disagree. I do not construe the illegally-procured provision to reach such trivialities despite the reality that an individual who submitted an application for citizenship one day before fulfilling the residency requirements would technically have failed to "satisfy a statutory requirement which Congress has imposed as a prerequisite to the acquisition of citizenship by naturalization." *Fedorenko*, 449 U. S., at 515. However, if the Government could establish that a naturalized citizen had willfully misrepresented his or her time of residence and that he or she would have been denied citizenship if the true duration of residency had been known, that person would be subject to denaturalization under § 1451(a).

## III

The Government attempted to prove the existence of a disqualifying fact before the District Court by introducing videotaped deposition testimony, which it asserted proved petitioner's participation in the Kedainiai atrocities. The District Court found the deposition testimony unreliable and admitted the depositions only for the limited purpose of establishing that the atrocities occurred.[12] Because the Court of Appeals did not address the propriety of this ruling, I would vacate its judgment and remand the case for further proceedings not inconsistent with this opinion.

JUSTICE O'CONNOR, concurring in part and dissenting in part.

I join Parts I, II–A, and III of JUSTICE SCALIA's opinion in this case. For the reasons given in Part II of JUSTICE WHITE's opinion, however, I dissent from Part II–B of JUSTICE SCALIA's opinion. In my view, when the correct standard of materiality is applied to the facts of this case, the misrepresentations made by petitioner are properly viewed as material.

JUSTICE WHITE, dissenting.

In 1982, the Government filed a complaint to denaturalize petitioner. It set out three reasons why this action was justified. First, it tried to show that petitioner assisted in the arrest and execution of more than 2,000 civilians in Kedainiai, Lithuania, during a 2-month period in 1941. The Government offered three videotaped depositions taken in the Soviet Union as proof of this claim. Although the District Court observed that these depositions would strongly tend to prove the Government's case if they were admitted as evidence

---

[12] The difference between this case and the Court's hypothetical concerning an SS officer at Dachau, see ante, at 779, is critical. Proof by clear and convincing evidence that a naturalized citizen concealed his official status at Dachau would establish his lack of good moral character. In this case, however, there is no such proof of any official or unofficial connection between petitioner and the atrocities at Kedainiai.

without qualification, it admitted them only for the purpose of showing that the atrocities took place. Without the excluded evidence, the District Court held that the Government failed to prove this claim.

The Government also showed that petitioner had made certain false statements in applying for his visa and in his naturalization petition. These false statements concerned his date and place of birth, his wartime occupations, and his wartime residence: petitioner added two years to his age and misstated the city in which he was born, listed various occupations that he was engaged in from 1942 to 1947 without listing that he was a bookkeeper for several of those years, and swore that he had resided in another city rather than in Kedainiai at the time these atrocities occurred. The District Court found that petitioner had indeed made these misrepresentations, but that they were immaterial under 8 U. S. C. § 1451(a) because the true facts, if known, would not themselves have warranted denial of a visa and would not have led to an investigation. See *Chaunt* v. *United States*, 364 U. S. 350 (1960). It therefore did not inquire into what an investigation might have uncovered.

Finally, the Government asserted that petitioner's false representations, whether or not material, were in themselves sufficient to show that petitioner did not have good moral character and that therefore he did not qualify for naturalization under 8 U. S. C. §§ 1427(a) and 1101(f)(6). The District Court rejected this claim also, ruling that because the false statements at issue were not material, they were not in themselves sufficient to prove that petitioner lacked good moral character.

The District Court accordingly entered judgment for petitioner. The Government appealed, and the Court of Appeals reversed. Initially, the Court of Appeals agreed with the District Court that misrepresentations must be material in order to constitute sufficient grounds for finding lack of "good moral character" under § 1101(f)(6). It disagreed with

the District Court, however, with respect to the materiality of the false statements in the visa application and the naturalization petition, holding that the misrepresentations about birth and age would have triggered an investigation that *probably* would have led to the discovery of facts disqualifying petitioner for a visa and for naturalization. It did not rule on the Government's further submission that the District Court erred by not admitting the videotaped depositions into evidence without qualification.

This case has been argued and now reargued before this Court. The Court today reverses the judgment of the Court of Appeals and remands for further consideration of several issues. Although I agree with Parts I, II–A, and III–A of the Court's opinion, I disagree with other parts and with the result it reaches. I therefore dissent.

## I

I would affirm the judgment below and grant the Government's petition for denaturalization. The Court holds, and I agree, that there was error in the holding below that petitioner's misrepresentations must be material in order to constitute sufficient grounds for finding that petitioner lacks "good moral character" under § 1101(f)(6). As the Court states, the statute "does not distinguish between material and immaterial misrepresentations," but instead "denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits." *Ante,* at 779–780. In addition to the language of § 1101(f)(6), which in itself compels this conclusion, the legislative history of the 1961 amendments to the statute, Pub. L. 87–301, § 18, 75 Stat. 656, shows that Congress sought to *broaden,* not restrict, the grounds upon which naturalization could be revoked.[1]

---

[1] Prior to 1952, "illegal procurement" constituted grounds for revoking a citizen's naturalization. When Congress enacted § 340 of the Immigration

804

In this connection, we must bear in mind the necessity of striking an appropriate balance between the serious consequences that attend loss of citizenship and the need for "strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." *Fedorenko* v. *United States*, 449 U. S. 490, 506 (1981). We need not decide in this case whether § 1101(f)(6) would bar naturalization of an individual who offered a single piece of false testimony in only one instance or who later offered a reasonable explanation for why misstatements were made; we also need not decide whether such a construction of the statute would be inconsistent with a proper balancing of the two important but opposing considerations set out above. There may well be cases in which a single willful but immaterial misrepresentation would be insufficient to establish lack of good character, but would constitute grounds for denaturalization if it were material. Similarly, there are cases like this one in which repeated and numerous willful misrepresentations justify a

and Nationality Act of 1952, it dropped, without explanation, the "illegal procurement" provision, adding in its stead the "concealment of a material fact" or "willful misrepresentation" language. The deleted provision was reinserted in § 1451(a) by the 1961 amendments, Pub. L. 87–301, § 18, 75 Stat. 656. The House Report accompanying the amendments noted that "[e]limination of the illegality ground bars denaturalization under section 340 unless it is proved that the naturalized person has been guilty of wrongdoing amounting to concealment of a material fact or willful misrepresentation. . . ." H. R. Rep. No. 1086, 87th Cong., 1st Sess., p. 38 (1961). The Report explained that "[p]roof of concealment of material facts or willful misrepresentation . . . is fraught with difficulty," *id.*, at 39, and that the amendment to § 1451(a) was necessary because "[t]he congressional mandate that no person shall be naturalized unless possessed of certain qualifications is ineffectual unless there is also statutory provision for revoking citizenship where the prerequisites did not in fact exist." *Ibid.* These statements evince clear congressional intent that "illegal procurement" be maintained as a *separate* basis for denaturalization, and do not sanction collapsing § 1101(f)(6) into the willful and material misrepresentation or concealment provision of § 1451(a).

finding of lack of good moral character notwithstanding that the misrepresentations may not involve material facts.

Here, petitioner's false testimony was not confined to one occasion, nor did it concern only a single piece of evidence. And at no time before or during the naturalization process did petitioner voluntarily step forward and attempt to ex- plain the reasons for his various misrepresentations. To the contrary, the facts as found by the District Court demonstrate clearly, unequivocally, and convincingly that petitioner engaged in a pattern of repeated misrepresentations and nondisclosures at both the visa application stage and during his naturalization proceedings. The District Court found:

> "Throughout his visa and citizenship proceedings [petitioner] misrepresented the date and place of his birth. In addition in his application for a visa [petitioner] failed to disclose (and therefore concealed) his presence in Kedainiai during the 1940–42 period and he failed to disclose (and therefore concealed) that he had been a bookkeeper-clerk in the Kaunas brush and broom establishment during the 1941–44 period. [Petitioner] in effect perpetuated these non-disclosures or concealments throughout his naturalization proceedings by representing that the information contained in his visa application was correct." 571 F. Supp. 1104, 1139 (NJ 1983).[2]

---

[2] On October 23, 1953, petitioner swore under oath before a naturalization examiner that the contents of his naturalization forms were true. As stated above, this testimony was false in that petitioner supplied an incorrect date and place of birth, and he represented that the information he had supplied in the visa application was true. This false testimony falls within the coverage of § 1101(f) because petitioner offered it "during the period for which good moral character is required to be established." Although petitioner's false testimony given at the visa application stage is not, standing alone, similarly covered by this provision, it is directly relevant to the "good moral character" determination. Section 1427(e) provides that in making this determination, a court "shall not be limited to the petitioner's conduct during the five years preceding the filing of the petition, but may

The congressional mandate expressed in § 1101(f)(6) speaks clearly to such a pattern of falsehoods, and that statute would have precluded a determination in 1954 that petitioner possessed "good moral character." Accordingly, petitioner lacked an essential prerequisite to becoming a naturalized citizen, and he is now subject to denaturalization for having "illegally procured" his citizenship. § 1451(a).

Despite its recognition that materiality is not required by § 1101(f)(6), the Court declines to uphold the judgment below, and remands the case for further consideration of one point of law and one point of fact. Neither point is at all substantial. The point of law is whether petitioner's misrepresentations constituted "testimony" within the meaning of the statute. As the Court notes, the term "testimony" in § 1101(f)(6) has been construed as referring only to oral evidence, and thus as excluding the written documents submitted by petitioner in his naturalization petition. Yet petitioner in this case did make oral misrepresentations: he testified falsely when he swore under oath before a naturalization examiner that the contents of his naturalization forms were true. Deposition of Julius Goldberg, App. 145–162. See also *Matter of Ngan*, 10 I. & N. Dec. 725 (1964). Furthermore, he had testified falsely in order to obtain his visa into this country.

The point of fact is whether petitioner made these misrepresentations "for the purpose of obtaining any benefits" under the immigration and naturalization laws. There is no difficulty about this point either. The willful misrepresentations at issue here were made in the context of petitioner's naturalization petition and were made earlier at the visa

---

take into consideration . . . the petitioner's conduct and acts at any time prior to that period." It is also of some interest, though irrelevant to this determination, that petitioner was still lying in 1981, when he tried to explain his previous falsehoods. App. 79–137. The trial court also found that he falsely denied at trial his membership in a local rifleman's organization that at the time of the atrocities provided military training to its members and on occasion assisted German occupation forces.

stage. The fact that the misrepresentations were willful, coupled with the fact that they were made during proceedings and on documents required for immigration and naturalization purposes—indeed, the very proceedings and documents that petitioner was required to complete in order to "obtai[n]" the "benefits" he sought of gaining naturalization—satisfies the elements of § 1101(f)(6). The District Court itself found that petitioner's naturalization petition was false *in particular* because it "stated that defendant had not previously given false testimony to obtain benefits under the immigration and naturalization laws." 571 F. Supp., at 1138.[3] In light of this specific finding by the District Court, there is no justification for remanding this issue to be resolved *again* by the trier of fact.

## II

Because the Court declines to affirm the decision below on the basis of § 1101(f)(6), it finds it necessary to revisit the definition of the term "material" as it is used in § 1451(a). The Court today holds that the proper test of materiality is whether the misrepresentations "had a natural tendency to influence the decisions of the Immigration and Naturalization

---

[3] The Court phrases this inquiry as whether petitioner made these misrepresentations with "the subjective intent of obtaining immigration or naturalization benefits," and finds it necessary to remand on this issue because issues of intent are properly matters for resolution by the trier of fact. *Ante*, at 780, 782. This approach rests on a recasting of the statutory language, which requires that the misrepresentations be made "for the purpose of obtaining" such benefits, but even if those two linguistic formulations were exactly the same, it is quite clear that when misrepresentations of fact are made in the process of applying for immigration and naturalization benefits, in a very real and immediate sense those misrepresentations are made "for the purpose of obtaining" such benefits, and at least in this case all of this is so clear that we should find it to be established as a matter of law. Although the Court is certainly correct that issues of intent are normally reserved for resolution by the trier of fact, I do not think that we should prolong proceedings unnecessarily by parsing matters in microscopic detail, creating a legion of subissues, and demanding their resolution while losing sight of what is both clear and dispositive about this case.

Service." *Ante,* at 772. I do not disagree with this defini-
tion, but the Court's application of the definition in this case
is flawed.

To begin with, the Court finds it proper under § 1451(a) to
consider only the misrepresentations petitioner made in his
naturalization proceedings but not those made in his earlier
visa proceedings. The view of the United States is much
more persuasive: the misrepresentations made by petitioner
at the visa stage were instrumental to his procuring natural-
ization, for by obtaining the visa petitioner obtained lawful
admission to residence in this country, which is one require-
ment for naturalization under § 1429. See also *Fedorenko,*
449 U. S., at 518–520 (BLACKMUN, J., concurring in judg-
ment). The Court responds that by that logic, *any* misrep-
resentation that helps an individual to obtain *any* prereq-
uisite to naturalization, such as English literacy, would be
considered material. These two things, however, are not
the same, and the Court's supposed extension of its logic is
merely foolish. The visa proceedings and the naturalization
proceedings are intimately related not only because they both
are proceedings governed by the same provisions of the im-
migration and naturalization laws, but also because the visa
and the certificate of naturalization are obtained as part of
the same process for obtaining citizenship, and both must be
*lawfully* procured. For example, it is not mere residence in
this country that is a prerequisite to naturalization, but resi-
dence after being "lawfully admitted." § 1429. It makes no
sense, on the other hand, to speak of proceedings to attain
"lawful" literacy skills or a "lawful" understanding of Ameri-
can history and government, as required under § 1423, and
the statute does not speak in these terms but instead mani-
fests complete and understandable indifference as to how the
individual came by those proficiencies. Thus the visa pro-
ceedings can accurately be regarded as one crucial stage in
the naturalization proceedings themselves, yet the time
spent acquiring literacy skills or an understanding of Ameri-

can history and government obviously cannot be regarded as a stage in those proceedings.

Even if I were to accept the proposition that we should consider only the materiality of the misrepresentations that petitioner made in the naturalization proceedings, those misrepresentations surely had a natural tendency to influence the decisions of the INS. As an initial matter, there is no requirement that the Court focus only on petitioner's misrepresentations about his date and place of his birth and leave aside his other potentially more significant misrepresentations that were also identified by the District Court.[4] But even limiting the focus as the Court does, I would find these statements to be material. In reaching this conclusion I would ask not only whether these misrepresentations of fact would have a natural tendency to influence the decisions of the INS, but also whether the fact of these misrepresentations *itself* would have had such a tendency. In other words, the proper inquiry is not only whether the true date and place of birth, in isolation, would have aroused suspicion, but also whether an investigation would have ensued had petitioner revealed the true facts and thereby disclosed the discrepancy between them and the false statements in his supporting documents. Former Ambassador Seymour Maxwell Finger, Vice Consul in Stuttgart in January 1947, testified that if there were discrepancies between the visa application and the supporting documents an investigation certainly would have occurred, a view that is consistent with the regulations then in effect. See 22 CFR § 61.329 (Supp. 1946).

---

[4] The District Court found as a matter of fact that petitioner also misrepresented his residence and employment during the time in which the atrocities occurred at Kedainiai. 571 F. Supp. 1104, 1139 (NJ 1983). The correctness of those factual findings has not been challenged. The Government, as respondent, urges us to consider the effect of these other misrepresentations as an additional reason for affirming the decision below, which is entirely proper.

The Court of Appeals arrived at the same conclusion, and the United States supports this construction of the statute, which is a sound one. The materiality of misrepresentations may be, but need not be, established by considering the true facts alone. It also may be shown by a comparison between those true facts and the false assertions made about those same matters. Therefore, when the plurality states that "[w]hat must have a natural tendency to influence the official decision is *the misrepresentation itself . . . the failure to state the truth,*" *ante,* at 776 (emphasis added), it is wrong to limit its consideration to whether those true facts alone, if known, would have had a natural tendency to influence the decisions of the INS. Instead, it should also consider whether "the misrepresentation itself . . . the failure to state the truth" would have had such a tendency; this inquiry also encompasses the INS' knowing the fact that the true facts do not match the false assertions that the individual seeking naturalization has made about those same matters. For whether a misrepresentation has actually been made is itself a matter of fact, and in certain circumstances this fact alone may possess great significance. Unless a court is to pretend that petitioner's lies themselves are not facts, it defies reality to conclude that "official knowledge of the misrepresented fact," *ante,* at 775, means only that the INS now knows how to correct the lies but must not take into account the fact that those lies have been told.

For these reasons, I would affirm the decision below on this ground also. At the very least I note that it is open to the trier of fact on remand to consider whether knowledge of petitioner's repeated and numerous misrepresentations would have had a natural tendency to influence the decisions of the INS.

### III

As a final point, it should be emphasized that the Court of Appeals never passed on the correctness of the District Court's determination that the videotaped depositions could

not be admitted into evidence unqualifiedly because they were inherently unreliable.[5]  On remand, this issue should be resolved definitively.  If the depositions are found to be admissible without qualification, rather than merely for the limited purpose allowed by the District Court, then the petition for denaturalization would be granted regardless of how the other issues are resolved, for it is undisputed that if petitioner were shown to have participated in the mass arrests and executions at Kedainiai, he never would have qualified for naturalization and thus now would be properly subject to denaturalization.

I respectfully dissent.

---

[5] The District Court found the three videotaped depositions to be unreliable largely because they were taken in the Soviet Union, which "has a strong state interest" in this case and which "on occasion distorts or fabricates evidence in cases such as this involving an important state interest," and because these depositions "were conducted in a manner which made it impossible to determine if the testimony had been influenced improperly by Soviet authorities."  571 F. Supp., at 1132.