**UNITED STATES of America, Plaintiff,**

v.

**Nikolaus SCHIFFER, Defendant.**

**Civ. A. No. 91–5644.**

United States District Court,
E.D. Pennsylvania.

Feb. 25, 1992.

Catherine Votaw, Philadelphia, Pa., Elliot M. Rockler, Robin Kofsky Gold, Washington, D.C., for plaintiff.

William E. Jones, Abington, Pa., for defendant.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

This is a civil action under section 340(a) the Immigration and Nationality Act of 1952 to revoke the citizenship of Defendant Nikolaus Schiffer. 8 U.S.C. § 1451(a). Schiffer has filed a Motion to Dismiss the Complaint under Fed.R.Civ.P. 12(b)(6) stating several grounds, including mootness, failure to state a claim and laches. Having carefully considered the defendant's motion, as well as the Government's response and supplemental brief, and having heard oral argument on the motion in Easton, Pennsylvania on January 15, 1992, we now deny Defendant's Motion to Dismiss, and allow this case to proceed, for the following reasons.

## I. STANDARD FOR MOTION TO DISMISS

Fed.R.Civ.P. 12(b)(6) allows a court to dismiss "for failure to state a claim upon which relief can be granted." The criteria

which a court must use in deciding a motion to dismiss under Fed.R.Civ.P. 12(b)(6) are clear. "In reviewing a motion to dismiss a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6), all allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party. *Wisniewski v. Johns–Manville Corp.*, 759 F.2d 271, 273 (3d Cir.1985); *Rogin v. Bensalem Twp.*, 616 F.2d 680, 685 (3d Cir. 1980), *cert. denied* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981). *Sturm v. Clark*, 835 F.2d 1009, 1011 (3d Cir.1987). Also, "in deciding a Rule 12(b)(6) motion, factual allegations of the complaint are to be accepted as true and the complaint should be dismissed only if it appears to a certainty that no relief could be granted under any set of facts which could be proved. Reasonable factual inferences will be drawn to aid the pleader. *Amalgamated Transit Union v. Byrne*, 568 F.2d 1025, 1031 (3d Cir.1977) (in banc) (Aldisert, J., dissenting); *Knuth v. Erie–Crawford Dairy Cooperative Ass'n*, 395 F.2d 420 (3d Cir.1968)." *D.P. Enterprises v. Bucks County Community College*, 725 F.2d 943, 944 (3d Cir.1984); *see also H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2905–06, 106 L.Ed.2d 195 (1989).

## II. FACTUAL BACKGROUND

The Government alleges the following facts in its Complaint. Defendant Nikolaus Schiffer was born in Philadelphia, Pennsylvania on April 9, 1919. Approximately one year later, Schiffer's parents took him to Rumania, where they established a permanent residence. In 1941, Schiffer entered the Rumanian Army and swore allegiance to the King of Rumania. In July, 1943, Schiffer joined the "Nazi Waffen–SS *Totenkopfsturmbann* (Death's

Head Battalion)" and swore allegiance to Adolf Hitler, and while in that organization served as an armed guard at three different concentration camps in Germany and German-occupied Poland. He allegedly participated in and assisted the Nazis in persecuting various civilian groups, such as Jews, Gypsies and Poles, through confinement, corporal punishment, torture, forced labor and outright murder.

On October 17, 1952, the Department of State of the United States government issued a Certificate of Loss of Nationality of the United States to Schiffer, and on November 11, 1952, The Department denied Schiffer's application for an American passport. In April, 1953, Schiffer applied for a visa to enter the United States, the visa was issued and in May, 1953 Schiffer entered the United States. In June 1958 Schiffer filed a Petition for Naturalization and Statement of Facts with the United States District Court for the Eastern District of Pennsylvania. In those papers, Schiffer was required to list all organizations in which he had been a member, but he did not list the Waffen–SS *Totenkopfsturmbann* (Death's Head Battalion). He also swore that he was a person of good moral character and was attached to the principles of the Constitution.[1] On August 13, 1958, the District Court granted Defendant's petition and issued him Certificate of Naturalization No. 7993986.

Now, thirty-three years later, the Government has filed an action in this Court seeking to revoke Nikolaus Schiffer's citizenship. Schiffer has moved to dismiss the Complaint.

## III. DISCUSSION

### A. Failure to State a Cause of Action

Defendant Schiffer maintains that the Complaint fails to state a cause of action

---

**1.** Defendant Schiffer refers to many additional facts in his Motion to Dismiss that were not stated in the Complaint. Because we are limited on a Rule 12(b)(6) motion to the facts alleged in the complaint, we cannot consider these additional facts in our decision. If Defendant had presented the additional facts in a form allowable under Fed.R.Civ.P. 43(e) (sworn affidavits

or deposition testimony) we could have treated the Motion to Dismiss as a Rule 56 Motion for Summary Judgment, pursuant to Rule 12. Of course, defendant is free to seek summary judgment when the parties have had an opportunity to develop the facts of the case through discovery.

because it fails to plead or establish as a "condition precedent" that Defendant lost his birth citizenship, and because it fails to allege any specific acts of misrepresentation or concealment. In order to analyze this argument, we must first set out the elements of each count included in the Complaint.

■ The Complaint in this action contains four counts, each based on 8 U.S.C. § 1451(a), which provides that the United States Attorney may institute proceedings to set aside a citizen's naturalization on the grounds that naturalization was illegally procured or on the grounds that it was procured by concealment of a material fact or by willful misrepresentation. Counts I, II and III allege that Schiffer illegally procured his citizenship because he entered the country unlawfully, because he lacked good moral character and was not attached to the principles of the Constitution of the United States at the time of his naturalization. Count IV alleges that Schiffer procured his citizenship by concealment of a material fact or by willful misrepresentation.

■ The two grounds for revocation set forth in Section 1451(a) are distinct, and each requires pleading and proof of different facts. Defendant's citizenship may be revoked on grounds of illegal procurement if the Government pleads and proves that at the time of his naturalization Schiffer failed to meet any of the statutory requisites for naturalization. *Fedorenko v. United States*, 449 U.S. 490, 506, 101 S.Ct. 737, 747, 66 L.Ed.2d 686 (1981). The statutory requisites upon which the Government relies in this case are found in 8 U.S.C. § 1427. Subsection (a)(1) of that section requires that applicants for naturalization be "lawfully admitted for permanent residence." The Government contends that Defendant was not lawfully admitted because his visa was invalid, in that he was not eligible for citizenship because of his lack of good moral character. *See* 8 U.S.C. § 1182(a)(20) and 1182(a)(22). Section 1427 also requires that the applicant be "a per-

son of good moral character, attached to the principles of the Constitution of the United States...." The Government claims that because of his alleged persecution of civilians under the direction of the Nazis, and because he lied under oath when he said he was of good moral character and Defendant was not attached to the principles of the Constitution. While these allegations at first blush seem to be tautological, upon careful consideration we believe that the Government's Complaint alleges sufficient facts to support a claim that Schiffer failed to meet one or more of the statutory prerequisites when he was naturalized.[2]

■ To revoke Defendant's citizenship on grounds of concealment or misrepresentation, the Government must plead and prove four independent requirements: (1) The naturalized citizen must have misrepresented or concealed some fact; (2) the misrepresentation or concealment must have been willful; (3) the fact must have been material; and (4) the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment. *Kungys v. United States*, 485 U.S. 759, 108 S.Ct. 1537, 1544–45, 99 L.Ed.2d 839 (1988).

Defendant argues that the Government "has failed to plead any specific act of material misrepresentation or concealment in the naturalization process that would allow inquiry into the validity of naturalization." The Government responds that the Defendant's failure to list the Waffen–SS *Totenkopfsturmbann* (Death's Head Battalion) in response to Question 13 on Form N–400 (Application to File Petition for Naturalization and Statement of Facts for Preparation of Petition) was a willful concealment of a material fact. In addition, ¶¶ 28 and 29 of the Complaint alleges that Schiffer misrepresented in his Petition for Naturalization, filed with the United States District Court for the Eastern District of Pennsylvania on June 17, 1958, that he was of good moral character and attached to the principles of the Constitution. The Government claims that Schiffer was not

---

**2.** The sufficiency of the Complaint's allegations relating to the "procurement of citizenship" element of Counts I, II and III will be further discussed below.

of good moral character and attached to the principles of the Constitution because he voluntarily served as a concentration camp guard under Hitler's regime.

■ Defendant contends that Question 13 was too broad to support an allegation that failure to list "Waffen–SS" as an answer was a concealment of a material fact. The question asked the applicant to list all organizations in which he had been a member at any time. Defendant argues that although the only organization he listed was "German Army," this is synonymous with "Waffen–SS", and so there was no concealment. Firstly, the Complaint in this case says nothing about a response of "German Army," it simply states that Schiffer did not reveal his membership in the Waffen–SS. Since we must take all allegations in the Complaint as true for the purpose of this Motion, and since there is no evidence properly in the record to support Defendant's argument about his "German Army" answer, we cannot properly consider the argument that there was no misrepresentation because "German Army" is synonymous with "Waffen–SS." [3]

■ Defendant is correct in citing *Kungys v. United States* for the proper definition of materiality under § 1451(a)—whether the concealed or misrepresented fact had a natural tendency to influence the decisions of the decisionmaking body to which it was addressed. Defendant is not correct, however, when he argues that the Government must *prove* materiality by clear and convincing evidence in its complaint. Whether the fact concealed or misrepresented was material is a question of law, but the determination rests on factual evidentiary showings. *See Kungys v. United States,* 108 S.Ct. at 1547. For the purpose of this motion we must take the factual allegations as true—we do not at

this stage require plaintiffs to prove their case in their complaint, we merely require them to set out "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.Pro. 8(a). Under this standard, it is certainly possible that the Government will be able to prove at trial that the fact that Defendant had served as a concentration camp guard in the Waffen–SS would have influenced the INS's or the District Court's decisions in allowing Defendant to enter the country and in granting him naturalization.

We must agree that the allegations in the Complaint are sufficient as to the first three elements required for Count IV—(1) The naturalized citizen must have misrepresented or concealed some fact; (2) the misrepresentation or concealment must have been willful; (3) the fact must have been material. We will now turn to the question of whether the Complaint properly alleges the "procurement of citizenship" element of § 1451.

### B. Schiffer's Birth Citizenship

#### 1. Is it at issue?

A large portion of Defendant Schiffer's brief in support of his Motion to Dismiss focuses on the question of whether or not he ever lost his original birth citizenship.[4] Although we do not completely agree with Defendant's rather confused position on why the loss of his birth citizenship is in issue in this case, for the reasons given below we do find that the Government has the burden of proving by a preponderance of the evidence that Schiffer performed an expatriating act with the intent to relinquish his United States nationality. *See* 8 U.S.C. § 1481; *Vance v. Terrazas,* 444 U.S. 252, 266–67, 100 S.Ct. 540, 548–49, 62

---

**3.** We note, however, that at least one other court has found that the Waffen–SS was never a part of the German army. *See United States v. Schellong,* 717 F.2d 329, 331 (7th Cir.1983), *cert. denied* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984).

**4.** The Fourteenth Amendment of the United States Constitution provides that "all persons

born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States." Congress has no power to "restrict the effect of birth, declared by the Constitution to constitute a sufficient and complete right to citizenship." *United States v. Wong Kim Ark,* 169 U.S. 649, 703, 18 S.Ct. 456, 477, 42 L.Ed. 890 (1898).

L.Ed.2d 461 (1980).[5]

The reasons which Defendant offers for putting his alleged loss of his birth citizenship in issue are (1) that lack of birth citizenship is a condition precedent which the Government must plead or establish before it may bring a revocation action under § 1451; (2) that Defendant has a due process right to appeal the 1952 Certificate of Loss of Nationality issued *ex parte* by the State Department;[6] (3) that if Defendant never lost his birth citizenship, an action to revoke his naturalization is moot since it will have no legal effect if successful.

The Government responds that Defendant's birth citizenship or loss thereof is irrelevant, and need not be pleaded, because this is a § 1451 action to revoke naturalization, not a § 1481 action to adjudicate loss of nationality. In a somewhat contrary sub-argument, the Government contends that its Complaint does in fact allege that Schiffer lost his birth citizenship because it states that the Department of State issued a Certificate of Loss of Nationality of the United States to defendant. Further, the Government contends that Defendant is barred from contesting his loss of birth citizenship because of a statutory time bar.

█ Defendant's loss of birth citizenship is properly at issue in this case for three reasons. First, one of the elements of each of the four counts of the Complaint is that the defendant *procured citizenship*. *See Kungys v. United States*, 108 S.Ct. at 1549. "That requirement demands, first of all, that citizenship be obtained as a result of the application process...." *Id.* If Defendant was already a citizen when he was naturalized, the result of the naturalization process was not the procurement of citizenship, but merely the procurement of an irrelevant document. Thus, Defendant's

non-citizenship when naturalized is part of the Government's *prima facie case*.

Second, the Complaint itself describes this as "an action to revoke the citizenship of Nikolaus Schiffer." The relief requested is a "[j]udgment forever restraining and enjoining defendant from claiming any rights, privileges, or advantages under any document evidencing United States citizenship." The first paragraph in the "Facts" section of the Complaint admits that "Defendant was born in Philadelphia, Pennsylvania," a fact which entitles him to citizenship under the first clause of the Fourteenth Amendment. *United States v. Wong Kim Ark*, 169 U.S. at 703, 18 S.Ct. at 477. It is difficult to argue that Defendant's birth citizenship is not at issue, while simultaneously asking us to enter a decree that effectively revokes it. The Government, it seems, asks us to rip up Defendant's birth certificate while being very careful not to touch it.

Lastly, we come to Defendant's argument that this action is moot because the revocation of his naturalization citizenship has no legal effect, given his still-existent birth citizenship. It is well established that the Case or Controversy Clause of Article III of the Constitution prohibits a federal court from granting judgments that will have no practical effect. *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976) (plaintiff must show an injury to himself that is "likely to be redressed by a favorable decision"), *cited in Whitmore v. Arkansas*, 495 U.S. 149, 155–56, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990); *see also Step Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643, 647 (3d Cir.1990) (limiting judgments issued under the Declaratory Judgment Act to those meeting the constitutional re-

---

5. See discussion of burdens of proof under *Terrazas* in footnote 8.

6. We do not discuss this point at any length in this opinion because we do not understand what real relevance an appeal of the issuance of the Certificate of Loss of Nationality has in this proceeding. The Certificate did not effect the

alleged loss of nationality, and it is not the basis for the instant lawsuit. It is merely an administrative method for the Government to keep track, for informational purposes, of those persons it considers to have voluntarily relinquished citizenship. *Whitehead v. Haig*, 794 F.2d 115, 118 (3d Cir.1986).

quirement that the judgment be of practical help, or utility).

In the case at bar, if the facts show that Defendant Schiffer never surrendered his birth citizenship, we may be forced to conclude that a judgment revoking his naturalization certificate would be of no practical effect, and that the Court is therefore without jurisdiction to render such a judgment. Since the Court has a duty to ensure that it is acting within its jurisdiction, the issue of Defendant's birth citizenship must be resolved in this proceeding.

### 2. The Statute of Limitations

In its Memorandum in Response to Defendant's Motion to Dismiss, as well as in its supplemental memorandum, the Government urges us to bar Defendant from contesting the Government's assertion that he lost his birth citizenship during World War II. It is the Government's position that Defendant lost the right to assert his citizenship because he did not bring an action for a declaratory judgment declaring his United States nationality within five years of the issuance of the Certificate of Loss of Nationality or the denial of his passport application—both of which occurred in late 1952.

At the time the Certificate of Loss of Nationality was issued and Defendant's passport application was denied (October 17 and November 11, 1952, respectively), there existed a mechanism for bringing suit in a United States District Court to obtain a declaratory judgment of United States nationality when a person claims a right or privilege as a United States national and is denied that right or privilege. *See*

§ 503 of the Nationality Act of 1940 (hereinafter the "1940 Act"), 8 U.S.C. § 503 (repealed). A later Act of Congress, the Immigration and Nationality Act of 1952 (hereinafter the "1952 Act"), repealed that statute and substituted a similar mechanism for obtaining a declaratory judgment of citizenship, but added a requirement that "[a]n action under this subsection may be instituted only within five years after the final administrative denial of such right or privilege." 8 U.S.C. § 1503 (effective December 24, 1952). The Government argues that although the 1940 Act did not contain an express limitations period, we should impute a limitations period from the 1952 Act or from other provisions of the 1940 Act.[7]

The Government's argument reflects a misunderstanding of the procedural posture of this case. By asserting his birth citizenship Defendant has not attempted to "convert this into a proceeding for declaration of United States nationality under 8 U.S.C. § 1503(a)," thus subjecting himself to any limitations periods contained in that statute. Plaintiff's Memorandum in Response to Defendant's Motion to Dismiss at 14. Rather, as discussed above, Defendant's alleged loss of nationality is an unavoidable element of Plaintiff's case. Defendant is not trying to avail himself of a statutorily-created remedy long after the statutory limitations period has expired—he is not seeking any remedy at all, rather he is claiming as a defense to the Government's own action a Constitutional right to citizenship that cannot be taken away by Congress without his consent. *See Vance*

---

7. We note that the Third Circuit Court of Appeals has treated the five year provision of § 1503 as merely a statute of limitations on bring suit under that statutory provision. *Whitehead v. Haig*, 794 F.2d 115 (3d Cir.1986). In that decision, however, the Court was not required to consider the question in depth, or to rest its decision on that point, because it held that the "final administrative denial" for § 1503 purposes had taken place when the plaintiff's passport application was denied, in 1980, rather than when a Certificate of Loss of Nationality was entered in 1965. The plaintiff in that case had formally renounced his United States citizenship in 1965, and had subsequently traveled

in the United States on an Irish passport, yet was permitted to bring a § 1503 action in 1981, sixteen years later. At least one court has dismissed a § 1503 action as time-barred, but in that case the plaintiff claimed citizenship under a statute granting citizenship to persons born abroad whose parents are United States citizens, as long as they meet certain statutory conditions. *Icaza v. Shultz*, 656 F.Supp. 819 (D.D.C. 1987). Thus, the plaintiff's citizenship claim in that case was wholly statutory, and not protected to the same degree as Fourteenth Amendment citizenship, granted to all persons born or naturalized in the United States. *Id.* at 823.

*v. Terrazas,* 444 U.S. 252, 259–260, 100 S.Ct. 540, 545, 62 L.Ed.2d 461 (1980); *Afroyim v. Rusk,* 387 U.S. 253, 257, 87 S.Ct. 1660, 1662, 18 L.Ed.2d 757 (1967).

 The Government asks us to interpret the 1940 and 1952 Acts as designating failure to initiate a lawsuit within five years of any questioning of a person's status as a United States citizen by an agent or department of the federal government as an expatriating act, thereby in effect creating an irrebuttable presumption that a person who fails to do so has acted (or failed to act) with the specific intent to relinquish his citizenship. Such a presumption would directly contradict the Supreme Court's holding in *Vance v. Terrazas.* In *Terrazas* the Supreme Court restated the holding of *Afroyim* that "reject[ed] the idea ... that, aside from the Fourteenth Amendment, Congress has any general power, express or implied, to take away an American citizen's citizenship without his assent ... § 1 of the Fourteenth Amendment is "most reasonably read as defining a citizenship which a citizen keeps unless he voluntarily relinquishes it." 444 U.S. at 259–260, 100 S.Ct. at 545. The Court in *Terrazas* upheld a Congressional enactment of a "preponderance of the evidence" standard of proof in loss of nationality cases on the ground that Congress has the authority under Article I, § 8, cl. 9 of the Constitution to create inferior federal courts, and traditionally this power includes the power to prescribe rules of evidence and standards of proof in those courts. *Id.* at 265–66, 100 S.Ct. at 548. At

the same time, the Court refused to interpret § 1481(c) to create even a *rebuttable* presumption of intent to relinquish United States citizenship. 444 U.S. at 268, 100 S.Ct. at 549.[8]

 We will not give an unconstitutional construction to an Act of Congress which, by its own terms, can be interpreted in a constitutional way. The words "[a]n action under this subsection may be instituted only within five years after the final administrative denial of such right or privilege," taken literally, apply only to actions under § 1503 by individuals seeking declarations of United States citizenship, and not to every instance in which a party raises the issue of loss of nationality in a lawsuit. If Congress had intended to create a universal bar to challenging loss of citizenship, it could easily have said so in clear terms—for instance the Act could have read "no person shall assert United States nationality in any proceeding if an action to declare such nationality is not brought under this section within five years after the first final administrative denial of any right or privilege of United States nationality." Congress did not enact such a law because it probably recognized that it could operate to unconstitutionally revoke citizenship. As an example, if a local post office rejected a person's passport application for something as simple as the failure to bring a birth certificate with them they could lose their citizenship forever if they did not start legal proceedings within five years.[9]

---

**8.** The Act stated "any person who commits or performs, or who has committed or performed, any act of expatriation under the provisions of this chapter or any other Act shall be presumed to have done so voluntarily, but such presumption may be rebutted upon a showing, by a preponderance of the evidence, that the act or acts committed or performed were not done voluntarily." 8 U.S.C. § 1481(c) (this provision is now part of subsection b). This presumption of voluntariness applies only to the expatriating act, not to the separate element of *intent to relinquish citizenship. Vance v. Terrazas,* 444 U.S. at 267–69, 100 S.Ct. at 549. In *Vance v. Terrazas* the Supreme Court made it clear that intent to relinquish citizenship and voluntariness of the expatriating act are two distinct elements, and that the court may not presume

an intent to relinquish citizenship, placing the burden of rebutting that presumption by a preponderance of the evidence on the party asserting citizenship. However, it is permissible for Congress to place upon the party asserting citizenship the burden of proving by a preponderance of the evidence that the expatriating act was not performed *voluntarily.* This merely follows "the normal rule that duress is an affirmative defense to be proved by the party seeking to rely on it." 444 U.S. at 269, n. 10, 100 S.Ct. at 549, n. 10.

**9.** While this example may sound far-fetched, courts have stretched § 1503 to just this extent when seeking a basis to assert jurisdiction over claims for declarations of U.S. nationality. For example, in *Chin Chuck Ming v. Dulles,* 225 F.2d

The 1940 and 1952 Acts were intended to be a confirmation, or at most a clarification, of an existing right to a declaratory judgment of United States nationality. Congress did not intend to supplant all other remedies or methods of seeking judicial adjudication of citizenship. *See Rusk v. Cort*, 369 U.S. 367, 377, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962) (a person outside the United States who has been denied a right of citizenship may bring an Administrative Procedure Act action for declaratory and injunctive relief regarding United States nationality despite the fact that he has not complied with the requirements of section 1503, section 360 of the 1952 Act); *Kum Chor Chee v. Clark*, 384 F.2d 918, 919 (9th Cir.1967) (a plaintiff who was denied entry into the United States in 1937 could bring an action in 1965 under § 503 of the 1940 Act for a declaration of citizenship because the 1940 Act "was intended to make judicial review of claims to citizenship more readily available, not to limit or destroy opportunities for such review which existed when the Act was adopted."). It would twist this intent beyond recognition to allow the 1940 Act to be used as a vehicle by the Government to seek to cut off a native-born American's citizenship without any type of hearing, when it was intended as another type of vehicle for those claiming citizenship.

Because we find that a statute of limitations for bringing an action under § 503 or § 1503 of the 1940 or 1952 Acts would not bar a person born in this country from asserting his birth citizenship in an action by the Government to revoke citizenship, there is no need to make a determination of whether such a limitations period would be constitutional, or a determination of which limitations period would apply—the 1952 Act five year limitations period, a limitations period found elsewhere in the 1940 Act, or one found in state law. There is also no need to address the questions of laches and equitable tolling raised in both parties' briefs.[10]

### 3. Sufficiency of Allegations of Loss of Citizenship

 As discussed above, the "procurement of citizenship" element of 8 U.S.C. § 1451 requires that the Government allege in its Complaint sufficient facts to support an inference that Defendant was not already a citizen when he was naturalized. The allegations in paragraphs 8 through 20 that Defendant swore allegiance to two different foreign sovereigns, served in the armed forces of two different foreign states, including the armed forces of Germany when the United States was at war with Germany, and that, consequently, the State Department issued a Certificate of Loss of Nationality, support an inference that Defendant relinquished his United States citizenship. Swearing allegiance to a foreign state and serving in the armed forces of a foreign state at war with the United States are considered to be expatri-

---

849 (9th Cir.1955) the Ninth Circuit Court of Appeals allowed a man to bring a § 503 action even though his passport application had not been denied, but had been pending for over fifteen months without any disposition. The Court held that the "denial of a right or privilege as a national of the United States" prerequisite would be satisfied even if the passport was delayed or denied because of lack of *evidence* of identity or nationality. In *Yung Jin Teung v. Dulles*, 229 F.2d 244, 246 (2d Cir.1956), the Second Circuit also held that a delay in processing an application can constitute a denial of a passport for § 503 or 1503 purposes. Under these cases, if we accept the Government's interpretation of § 1503 as an absolute time bar, the limitations period could begin without the citizen even knowing it.

10. The Government argues quite strenuously that it is unfair to require it to prove facts relating to events that happened over forty years ago, when Defendant could have brought a lawsuit as soon as he was notified that the Government did not consider him to be a citizen, while the evidence was still fresh. It may be difficult for the Government to unearth the long-buried information necessary to prove that Defendant relinquished his citizenship in the 1940's, but these facts are the same ones the Government will need to present in order to prove its claim that Defendant was not of good moral character and attached to the principles of the Constitution. Defendant did not initiate this lawsuit, and he is not responsible for any hardships the Government may encounter in proving the facts alleged in the Complaint.

ating acts if done with the intent to relinquish United States nationality. 8 U.S.C. § 1481. At this stage these facts are sufficient to support the allegation that Defendant procured citizenship in his naturalization proceeding, and to withstand a Motion to Dismiss.

## IV. CONCLUSION

■ Viewing the allegations of the Complaint in the light most favorable to the Government, and drawing all reasonable inferences from those allegations, we find at this point that the Government's Complaint states a claim upon which relief can be granted.[11] The factual question of whether Nikolaus Schiffer voluntarily relinquished his American citizenship acquired at birth and other serious issues will ultimately have to be resolved at trial on the merits or some other stage, after both parties have had an opportunity to conduct sufficient discovery.

**11.** To the extent that the "Introduction" section of Defendant's brief in support of his motion to dismiss states a claim of laches ("... the government should be barred from proceeding in this action because it has delayed institution of this process for in excess of thirty-eight years, quantitatively and qualitatively diminishing probative evidence.") we find that Defendant has failed to meet the standard required for a claim of laches. Even if we were to hold that laches is a valid defense in a denaturalization proceeding, (a proposition which the Supreme Court of the United States has found questionable, and which several lower courts have rejected outright) we would have to apply the standard that "[l]aches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961); *United States v. Schuk,* 565 F.Supp. 613, 615 (E.D.Pa.1983) (laches is not a defense in denaturalization proceeding); *United States v. Schmidt,* No. 88–9475, 1990 WL 6667, at *12 (N.D.Ill. Jan. 3, 1990), *aff'd* 923 F.2d 1253 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991). Defendant has not pointed to any fact of record showing a lack of diligence by the government, nor has Defendant demonstrated any prejudice to himself from such lack of diligence. Thus, we will not dismiss this action on the basis of laches.